Angel Enrique Villeda ALDANA, Jorge Augustin Palma Romero, Oscar Leonel Guerra Evans, Lyionhel McIntosh Rodriguez, Marel Martinez, Gumerzindo Loyo Martinez, Rigoberto Alvayero Hernandez, Plaintiffs–Appellants,

v.

DEL MONTE FRESH PRODUCE, N.A., INC., Bandegua, Compania De Desarrollo De Guatemala, Fresh Del Monte Produce, Inc., Defendants–Appellees.

No. 04–10234.

United States Court of Appeals, Eleventh Circuit.

July 8, 2005.

---

Jeffrey S. Vogt, Terrence P. Collings-worth, Natacha Thys, Intern. Labor

Rights Fund, Washington, DC, for Plain-tiffs–Appellants.

Brian Joseph Stack, Robert Harris, Stack, Fernandez, Anderson & Harris, P.A., Miami, FL, for Defendants–Appel-lees.

Matthew J. Eisenbrandt, Ctr. of Justice and Accountability, San Francisco, CA, for Amicus Curiae, Center for Justice and Ac-countability.

Before EDMONDSON, Chief Judge, WILSON, Circuit Judge, and RESTANI*, Judge.

PER CURIAM:

Plaintiffs–Appellants ("Plaintiffs") filed a twelve-count complaint against De-fendant–Appellee ("Del Monte") in the United States District Court for the South-ern District of Florida. The complaint alleged violations of federal and state laws.[1] The district court granted Del Monte's motion to dismiss for failure to state a claim on the federal law claims, and it dismissed the remaining state law claims for lack of jurisdiction. We affirm in part, vacate in part and remand.

## BACKGROUND

Because the district court granted Del Monte's motion to dismiss, the facts are

---

* Honorable Jane A. Restani, Chief Judge, Unit-ed States Court of International Trade, sitting by designation

1. When we refer to the "complaint," we mean the *third* amended complaint filed by Plain-tiffs on 5 February 2003. The thirty-one page, one-hundred-and-thirteen paragraph complaint is attached as an appendix to this opinion. By the way, the order upon which this appeal is based, is an order dismissing Plaintiffs' complaint without prejudice: the district court allowed Plaintiffs a stated time in which to amend their complaint again.

*Aldana v. Fresh Del Monte Produce, Inc.,* 305 F.Supp.2d 1285, 1308 (S.D.Fla.2003). Plain-tiffs chose to appeal instead of amending the complaint a fourth time. Because Plaintiffs filed their notice of appeal before the time to amend expired, they waived the right to amend later the complaint; and the dismissal became final for appeal purposes. *Schuur-man v. Motor Vessel "Betty K V",* 798 F.2d 442, 445 (11th Cir.1986).

taken from the well pleaded allegations of the complaint. *Chepstow Ltd. v. Hunt,* 381 F.3d 1077, 1080 (11th Cir.2004) (citations omitted). Plaintiffs are seven Guatemalan citizens currently residing in the United States. Del Monte is a Delaware company; its principal place of business is in Coral Gables, Florida. In Guatemala, Plaintiffs were officers in SITRABI, a national trade union of plantation workers. At the time in question, they represented workers on a Bandegua banana plantation in the municipality of Morales, Izabal. Bandeuga is a wholly-owned subsidiary of Del Monte.

SITRABI and Bandegua were negotiating a new collective bargaining agreement for workers at the plantation. While those negotiations were ongoing, Bandegua terminated 918 workers. SITRABI responded by filing a complaint in the Labor Court of Guatemala. Negotiations continued.

Plaintiffs allege that on or before 13 October 1999, Bandegua hired or established an agency relationship with a private, armed security force. Private security forces are permitted and regulated in Guatemala. According to Plaintiffs, on 13 October 1999, Del Monte agents met with the security force "to plan violent action against the Plaintiffs and other SITRABI leaders." Plaintiffs do not allege that government officials attended the meeting.

According to Plaintiffs, at 5:45 p.m. the security force, which is described as "a gang of over 200 heavily armed men," arrived at SITRABI's headquarters in Morales, Izabal. There, the security force held two Plaintiffs hostage, threatened to kill them, and shoved them with guns.

Throughout the evening, other SITRABI leaders were lured, abducted or otherwise forced to the headquarters and similarly detained.[2] Once the seven SITRABI leaders were in the headquarters, "a leader of the security force ... who claimed to be the President of the [municipal] Chamber of Commerce," blamed Plaintiffs for the area's economic decline. The official also explained that Plaintiffs' union activity could cause Del Monte to abandon the plantation. Later, a mayoral candidate appeared. While the candidate was at SITRABI headquarters, the security force "reached a consensus that the two main leaders of SITRABI [both of whom are Plaintiffs in this case] would be taken to a radio station ... where they would be forced to denounce the union." Plaintiffs also allege that the actual Mayor of Morales participated. He, along with "several other armed aggressors," allegedly accompanied Plaintiffs to a radio station. There, Plaintiffs, at gunpoint, announced the labor dispute was over and that they were resigning.

Members of the security force then forced the two Plaintiffs back to the headquarters. At headquarters, they received a facsimile of a "model resignation form," purportedly sent from Del Monte or Bandegua. The Plaintiffs then signed the letters at gunpoint and were released—after being detained for more than eight hours—at 2:00 a.m. on 14 October 1999. The leader of the security force allegedly threatened to kill Plaintiffs if they failed to leave Guatemala or relocated to Mexico. Plaintiffs now live in the United States.

Based on these allegations, Plaintiffs brought twelve claims against Del Monte

---

**2.** Plaintiffs allege that the SITRABI headquarters are one-hundred meters from the National Police office. Based on this spacial proximity, Plaintiffs conclude that "it was an absolute certainty that the National Police were aware of all events of the night."

and Bandegua in the district court. That court granted Del Monte's motion to dismiss for failure to state a claim. Plaintiffs have appealed the dismissal of their claims brought under the Alien Tort Act, 28 U.S.C. § 1350 ("ATA"), and the Torture Victim Protection Act, which is published as a historical and statutory note to the ATA, codified at 28 U.S.C. § 1350 (1991) ("TVPA").

## STANDARD OF REVIEW

We review motions to dismiss *de novo;* all facts are taken from the complaint. *Chepstow Ltd. v. Hunt,* 381 F.3d 1077, 1080 (11th Cir.2004) (citations omitted). Ambiguities are construed in the light most favorable to the nonmovant, Plaintiffs. *Miccosukee Tribe of Indians of Fla. v. So. Everglades Restoration Alliance,* 304 F.3d 1076, 1084 (11th Cir.2002). We can affirm the district court's dismissal of the complaint only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Jones v. Am. Gen. Life & Accident Ins. Co.,* 370 F.3d 1065, 1069 (11th Cir.2004) (citing *Cryder v. Oxendine,* 24 F.3d 175, 176 (11th Cir.1994) (internal quotations omitted)). But, "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Oxford Asset Mgmt., Ltd. v. Jaharis,* 297 F.3d 1182, 1188 (11th Cir.2002).

## DISCUSSION

1. *The Non–Torture Alien Tort Act Claims.*

█ The Alien Tort Act provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350 (2005). To obtain relief under the ATA, plaintiffs must be (1) an alien, (2) suing for a tort, which was (3) committed in violation of international law. *Abebe–Jira v. Negewo,* 72 F.3d 844, 848 (11th Cir.1996). The first two elements are not disputed. Del Monte does challenge Plaintiffs' contention that the underlying acts show a violation of the laws of nations: prohibitions against (1) cruel, inhuman, degrading treatment or punishment; (2) arbitrary detention; and (3) crimes against humanity.

█ The Supreme Court recently interpreted the Alien Tort Act in *Sosa v. Alvarez–Machain,* 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004). There, the Court explained that the ATA is jurisdictional in nature but that it also provides a cause of action "for the modest number of international law violations with a potential for personal liability at the time [of its enactment]." 124 S.Ct. at 2761.[3] According to the Court, causes of action under the ATA are not static; new ones may be recognized, if the claim is "based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th century paradigms we have recognized." 124 S.Ct. at 2761–62.[4] But the Court said that federal courts should exercise "great caution" when considering new causes of action, and maintain "vigilant doorkeeping ... thus [opening the door] to

---

**3.** Congress enacted the Alien Tort Act in 1789. The Court determined that three offenses were actionable at that time: violation of safe conducts, infringement of the rights of ambassadors, and piracy. *Sosa,* 124 S.Ct. at 2761.

**4.** Our conclusion differs from dicta contained in *Arce v. Garcia,* 400 F.3d 1340, 1345 n. 2 (11th Cir.2005) (interpreting *Sosa* as limiting the Alien Tort Act to a grant of jurisdiction, not a cause of action).

a narrow class of international norms [recognized] today." 124 S.Ct. at 2763, 2764.

■ Based largely on our reading of *Sosa*, we agree with the district court's dismissal of Plaintiffs' non-torture claims under the Alien Tort Act. We see no basis in law to recognize Plaintiffs' claim for cruel, inhuman, degrading treatment or punishment. In reaching this conclusion, we acknowledge that two district courts of this Circuit recognized such a cause of action. *See Mehinovic v. Vuckovic*, 198 F.Supp.2d 1322, 1347 (N.D.Ga.2002) (Bosnian war crimes); *Cabello v. Fernandez–Larios*, 157 F.Supp.2d 1345, 1361 (S.D.Fla. 2001) (political assassination) *aff'd on different grounds by* 402 F.3d 1148, 1161 (11th Cir.2005). But both of those courts relied on the International Covenant on Civil and Political Rights, *Mehinovic*, 198 F.Supp.2d at 1347, *Cabello*, 157 F.Supp.2d at 1361. *Sosa* explains that the International Covenant did not "create obligations enforceable in the federal courts." 124 S.Ct. at 2767. Accordingly, we affirm the district court's decision on the cruel, inhuman, degrading treatment or punishment claims.

We do the same for Plaintiffs' claim for arbitrary detention. In *Sosa*, the Court determined that "a single illegal detention of less than a day ... violates no norm of customary international law so well defined as to support the creation of a federal remedy." 124 S.Ct. at 2769. The detention alleged here was more frightening than the one in *Sosa;* still, the short time of the detention here causes the legal principle announced by the Court in *Sosa* to guide us. We, therefore, affirm the district court's conclusion.

■ We also agree with the district court's dismissal of the crimes against humanity claim. First, such crimes were not expressly plead in the complaint. *See Emory v. Peeler*, 756 F.2d 1547, 1550 n. 3 (11th Cir.1985) (considering only the "naked complaint" when reviewing a motion to dismiss). Second, to the extent that crimes against humanity are recognized as violations of international law, they occur as a result of "widespread or systematic attack" against civilian populations. *See Cabello v. Fernandez–Larios*, 402 F.3d 1148, 1161 (11th Cir.2005). Those kinds of words are not found in the complaint, but instead in Plaintiffs' appellate brief. The appellate brief cannot supply the necessary facts to overcome Del Monte's motion to dismiss. *See Emory*, 756 F.2d at 1550 n. 3. And, Plaintiffs' reliance—found exclusively in the appellate brief—on alleged systematic and widespread efforts against organized labor in Guatemala is too tenuous to establish a prima facie case, especially in the light of *Sosa*'s demand for vigilant doorkeeping.

2. *Claims For Torture Under The Alien Tort Act And Torture Victim Protection Act.*

a. State Action.

■ State-sponsored torture, unlike torture by private actors, likely violates international law and is therefore actionable under the Alien Tort Act. *See Kadic v. Karadzic*, 70 F.3d 232, 243–44 (2nd Cir. 1995) (citations omitted). The text of the Torture Victim Protection Act expressly requires the element of state action. Torture Victim Protection Act § 2(a), 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 (Historical and Statutory Notes)). In construing this state action requirement, we look "to the principles of agency law and to jurisprudence under 42 U.S.C. § 1983." *Kadic*, at 245. A claim for state-sponsored

torture under the Alien Tort Act or the Torture Victim Protection Act may be based on indirect liability as well as direct liability. *Cabello,* 402 F.3d at 1157. The Alien Tort Act "reaches conspiracies and accomplice liability," and the Torture Victim Protection Act reaches those who ordered, abetted, or assisted in the wrongful act. *Id.*

The complaint alleges three state acts or acts by state officials. First, Plaintiffs argue that Guatemala sanctions the acts of private security forces by permitting them to exist legally. (Compl. ¶¶ 66, 72). Second, Plaintiffs allege the police knew of and deliberately ignored the events at the SITRABI headquarters. (Compl. ¶ 55). Third, Plaintiffs say broadly that unnamed "public officials ... intentionally failed to take action in order to permit the violence to occur [and] were part of the security force." (Compl. ¶ 29). The complaint later names the Mayor as such an official, (Compl. ¶ 47), and it describes government officials of "the Bobos District" as "assisting" the security force. (Compl. ¶ 66).

■ Guatemala's registration and toleration of private security forces does not transform those forces' acts into state acts. *See Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 1971–74, 32 L.Ed.2d 627 (1972) (concluding state's alcohol licensing and regulatory scheme did not transform a private club with a liquor license into a state actor).

■ In addition, police inaction in response to events occurring not in their plain sight, but at least one hundred me-

ters and two walls away, does not establish state action.[5] This lack of state action is particularly definite where, as here, Plaintiffs do not allege sufficient facts to warrant the inference that the National Police knew of and purposefully turned a blind eye to the events. "[S]ome minimal pleading standard does exist .... 'Pleadings must be something more than an ingenious academic exercise in the conceivable.'" *Wagner v. Daewoo Heavy Indus. Am. Corp.,* 289 F.3d 1268, 1270 (11th Cir.2002) (discussing generally what might be a reasonable inference in the pleading context) (internal citation omitted) *rev'd en banc on other grounds,* 314 F.3d 541 (11th Cir. 2002).

■ Plaintiffs allege the police station was spacially near the SITRABI headquarters, which leads Plaintiffs *to deduce* that the proximity made it certain the police knew of the events in question. We must make reasonable inferences in Plaintiffs' favor, but we are not required to draw Plaintiffs' inference. "Bald assertions" will not overcome a Rule 12(b)(6) motion. *DM Research, Inc. v. College of Am. Pathologists,* 170 F.3d 53, 55, 56 (1st Cir.1999) (citation omitted) (affirming dismissal for failure to state a claim when complaint failed to allege "a factual predicate concrete enough to warrant further proceedings" and provided mere "speculations"). Likewise, "unwarranted deductions of fact" are not admitted as true in a motion to dismiss. *So. Fla. Water Dist. Mgmt. Dist. v. Montalvo,* 84 F.3d 402, 408 n. 10 (11th Cir.1996) (stating in dicta). The complaint here provides no factual

---

5. Paragraph fifty-five alleges that "As [Plaintiffs] walked outside [after resigning from the union], they all were able to see the National Police office, which was no more than 100 meters from the SITRABI office. It was an absolute certainty that the National Police were aware of all of the events of the night, and yet they did nothing to intervene to protect the SITRABI leaders."

basis to infer the police made a knowing choice to ignore Plaintiffs' alleged plight. It is unreasonable to infer, based on the facts alleged here (alleged torture occurring indoors and an allegedly coerced indoor radio address someplace else), that just spacial proximity provides a reasonable basis for knowledge or intent on the part of the police. *See generally Wagner,* 289 F.3d at 1272.

■ We cannot say, however, that a reasonable reading of the complaint's description of the Mayor's acts rules out state action. Paragraph twenty-nine is the first time government officials are mentioned: "public officials at the urging of Defendants and/or their agents intentionally failed to take action in order to permit the violence to occur. Further, various public officials were part of the security force." At least one public official, the Mayor, is identified by name in paragraph forty-seven: "Israel Vargas, who was the Mayor of Morales District ... and several other armed aggressors" took two Plaintiffs at gunpoint and against their will to a radio station. The complaint also alleges later, in paragraph seventy-two, that "government officials" actually "assisted" the security force.

In the context of the whole complaint, the district court appears to have read these passages to describe the Mayor as merely present and not an active member of the security force. *Aldana v. Fresh Del Monte Produce, Inc.,* 305 F.Supp.2d 1285, 1302 (S.D.Fla.2003). The district court's reading might be one reasonable reading

of the complaint. We cannot say, however, that it is the only reasonable reading of the complaint. Especially when read together with paragraphs twenty-nine and seventy-two, paragraph forty-seven can reasonably be read as depicting the Mayor as an "armed aggressor," not a mere observer. *See Magluta v. Samples,* 375 F.3d 1269, 1274–75 (11th Cir.2004) (reading complaint in its entirety when reviewing a motion to dismiss for failure to state a claim). *See also* 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1286 (3d ed. 2004) (a reviewing court gives effect to all averments). At its most specific point, the complaint states that the Mayor "and several other armed aggressors" took two Plaintiffs at gunpoint and against Plaintiffs' wills to a radio station. "At worst, this language is ambiguous ... and because the court was ruling on a motion to dismiss, the complaint should be construed in the light most favorable" to Plaintiffs. *Miccosukee Tribe of Indians of Fla. v. So. Everglades Restoration Alliance,* 304 F.3d 1076, 1084 (11th Cir.2002).

For Plaintiffs, the favorable construction of the complaint is that the Mayor was one of the armed aggressors. The Mayor's active involvement in the process could have provided a sufficiently affirmative act to establish state action.[6] *Cabello v. Fernandez–Larios,* 402 F.3d 1148, 1156 n. 2 (11th Cir.2005). The Mayor's "mere presence" may not establish state action, but his alleged participation in the forcible events could. *See Cofield v. Randolph County Comm'n,* 90 F.3d 468, 471 (11th

---

6. We stress that this litigation is at a preliminary stage that is very friendly to Plaintiffs. We cannot predict what evidence can be mustered at summary judgment (or beyond) that could support or refute this allegation from the complaint. We cannot be certain about the time that the Mayor arrived on the scene. Because we must construe the complaint in Plaintiffs' favor, we accept today that he was present for the alleged acts of torture described below.

Cir.1996). Because we believe the alleged acts are sufficient for now to establish state action on the part of the Mayor, we do not address Plaintiffs' other contention that the Mayor's inaction facilitated and caused their harm.

#### b. Torture Claims.

 The district court also decided that Plaintiffs' claims did not constitute torture under either the Alien Tort Act or the Torture Victim Protection Act. *Aldana v. Fresh Del Monte Produce, Inc.*, 305 F.Supp.2d 1285, 1294–95 (S.D.Fla.2003). A preliminary question we must decide is whether recovery is permitted under the TVPA and the ATA, and if so, whether "torture" means the same thing for both statutes. We conclude that a plaintiff may bring distinct claims for torture under each statute.

The statutory texts support this conclusion. Torture is actionable under the Alien Tort Act, but only if the conduct is "committed in violation of the laws of nations." 28 U.S.C. § 1350 (2005).[7] By contrast, Congress provided an express definition of torture in the Torture Victim Protection Act.[8] These two definitions suggest each statute provides a means to recover for torture as that term separately draws its meaning from each statute.

Precedent also supports this conclusion. In *Abebe–Jira v. Negewo*, 72 F.3d 844, 847–48 (11th Cir.1996), we construed the Alien Tort Act as conferring both a forum and a private right of action. Nothing in *Sosa* changes this conclusion; in fact, it confirms it. 124 S.Ct. at 2761–62. When describing the TVPA, the Supreme Court said it was an example of Congress providing a "clear mandate" to allow recovery for

---

7. The Supreme Court defines the law of nations as being determined, "[w]here there is no treaty, and no controlling executive or legislative act or judicial decision, [by] the customs and usages of civilized nations; and, as evidence of these, to the works of jurists and commentators who by years of labor, research and experience, have made themselves peculiarly well acquainted with the subjects of which they treat. Such works are resorted to by judicial tribunals, not for the speculations of their authors concerning what the law ought to be, but for trustworthy evidence of what the law really is." *Sosa*, 124 S.Ct. at 2766–67 (citing *The Paquete Habana*, 175 U.S. 677, 20 S.Ct. 290, 299, 44 L.Ed. 320 (1900)).

8. (1) the term "torture" means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or

a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind; and
(2) mental pain or suffering refers to prolonged mental harm caused by or resulting from—
 (A) the intentional infliction or threatened infliction of severe physical pain or suffering;
 (B) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;
 (C) the threat of imminent death; or
 (D) the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.
Torture Victim Protection Act § 3(b), 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 (Historical and Statutory Notes)).

claims "confined to [a] specific subject matter[:]" torture and extrajudicial killing. *Id.* at 2763. But the Court did not say that the authority granted in the Torture Victim Protection Act provided the exclusive authority to hear torture claims. *Contra Enahoro v. Abubakar*, 408 F.3d 877, 884–86 (7th Cir.2005).

■ We also rely on principles of statutory construction to reach our conclusion. To accept that the Torture Victim Protection Act provides the exclusive remedy for acts of torture is to accept that it amends the Alien Tort Act. Such an intent to amend is not apparent from the face of the statute, and "amendments by implication are disfavored. Only when Congress' intent to repeal or amend is clear and manifest will we conclude that a later act implicitly repeals or amends an earlier one." *Patel v. Quality Inn So.*, 846 F.2d 700, 704 (11th Cir.1988). That the TVPA, which was published in the Statutes at Large, appears in the United States Code as a historical and statutory note to the Alien Tort Act does not make the TVPA any less the law of the land. *See generally Schwier v. Cox*, 340 F.3d 1284, 1288 (11th Cir.2003).

Having decided that Plaintiffs can raise separate claims for state-sponsored torture under the Alien Tort Act and also under the Torture Victim Protection Act, we must decide whether the acts alleged in the complaint can be considered torture under (a) the law of nations (for ATA purposes); and (b) the TVPA's statutory definition. We conclude that Plaintiffs alleged sufficient facts to establish torture causing severe mental suffering under both statutes.

■ When courts seek to define torture in international law, they often look to the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, · G.A. Res. 39/46, U.N. GAOR, Supp. No. 51, U.N. Doc. A/39/51 (1984), reprinted in 23 I.L.M. 1027. *See, e.g., In re Estate of Ferdinand Marcos Human Rights Litig.*, 25 F.3d 1467, 1475 (9th Cir.1994); *Kadic*, 70 F.3d at 243–44. Federal immigration law relies on the Convention when deciding whether aliens may be deported to nations that would torture them. United States Policy With Respect to the Involuntary Return of Persons in Danger of Subjection to Torture § (f), 112 Stat. 2681–822 (1998) (codified at 8 U.S.C. § 1231 (Historical and Statutory Note)). *See also Cadet v. Bulger*, 377 F.3d 1173, 1194 (11th Cir.2004) (describing the Convention as providing "the only relevant definition of 'torture' " in the immigration context). Accordingly, we, for ATA purposes, too look to the Convention when deciding what constitutes torture according to the laws of nations. The Convention defines torture as

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.

Part I, Article I, G.A. Res. 39/46, U.N. GAOR, Supp. No. 51, U.N. Doc. A/39/51

(1984), reprinted in 23 I.L.M. 1027. The Torture Victim Protection Act provides a different definition. In some case, the different definitions might actually make a difference; we recall that neither Congress nor the Supreme Court has urged us to read the TVPA as narrowly as we have been directed to read the Alien Tort Act generally. *See Sosa*, 124 S.Ct. at 2761–62.

 Plaintiffs allege they were (a) in the custody or physical control of the security force; (b) suffered severe, prolonged mental and physical pain or suffering; by being (c) threatened with imminent death; for the purposes of (d) punishing Plaintiffs for their labor activities. The complaint alleges that Plaintiffs Hernandez, G. Martinez, M. Martinez, and Romero all were told they would be killed that night.[9] Plaintiff Aldana and M. Martinez were filmed with a video camera and told they "would be giving their last messages." (Compl. ¶ 48). The complaint does not mention specific threats against Plaintiff Rodriguez, nor does it say that Plaintiff Evans was told he would be killed that night.[10] But, another paragraph discusses a collective threat: taking pictures of the seven Plaintiffs, "stating that [a member of the security force] wanted a clear photo of the faces before he killed them all." (Compl. ¶ 45). These allegations describe imminent death threats: (1) the security force was heavily armed; (2) Plaintiffs were unarmed and restrained; and (3) for many hours the security force made specific threats that Plaintiffs (for their past acts) would be killed not sometime in the future, but that very night.

In addition, Plaintiffs allege in a paragraph addressing a negligent infliction of emotional distress claim, that they "have suffered and will continue to suffer … extreme and severe mental anguish and emotional distress." (Compl. ¶ 105).[11] All things considered, the acts alleged in the

---

9. The complaint alleges that members of the security force—who were armed, and thus had ready the means to kill—told Plaintiffs Evans and Romero that they would be killed because of their "activities on behalf of SITRABI." (Compl. ¶ 34). In paragraph forty-five, the complaint attributes a member of the security force telling Romero that he would be burned alive. Paragraph thirty-seven describes Plaintiff M. Martinez's abduction: members of the security force told him "that they were going to kill him." Paragraph forty-three alleges a member of the security force threatened Plaintiff G. Martinez by stating: "You won't mess with Bandegua after we cut your balls off and hang you!" The threat against Plaintiff Hernandez is contained in paragraph forty: a member of the security force "stepped forward and put a gun to Plaintiff Hernandez's head, threatening 'I'll make you smile.'"

10. Paragraph thirty-nine addresses Rodriguez's entry to the SITRABI headquarters: "He was ordered at gunpoint by a leader of the security force … to get out of his car and go into the SITRABI office."

11. The placement of the paragraph in another count is unimportant to our review of a district court's order dismissing a complaint under Rule 12(b) of the Federal Rules of Civil Procedure. We read the complaint as a whole. *Magluta v. Samples*, 375 F.3d 1269, 1274–75 (11th Cir.2004). In addition, a formulaic misstep by counsel is not fatal under the notice pleading standard (where fair notice is all that is required) of Federal Rule of Civil Procedure 8(a). *See generally, Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 122 S.Ct. 992, 998, 999, 152 L.Ed.2d 1 (2002) (interpreting Rule 8(a) as focusing the "litigation on the merits of a claim"). *See also* 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1286 (3d ed. 2004) (describing a pleading as judged "by the quality of its substance rather than according to its form or label and, if possible, it will be construed to give effect to all its averments"). Del Monte cannot say that it did not receive fair notice of the torture claim just because the language about lasting mental trauma was placed in another section of the complaint.

complaint could constitute torture—based on intentionally inflicted emotionally pain and suffering—under the Alien Tort Act and Torture Victim Protection Act.

Plaintiffs' allegations of intentionally inflicted physical pain and suffering do not meet the statutory elements of torture under either the Alien Tort Act or Torture Victim Protection Act, however. Much of the pleading about physical—as opposed to mental—torture is conclusory. For example, the complaint contains paragraphs describing some Plaintiffs as being "tortured with physical violence." (Compl. ¶ 34). These kinds of allegations cannot overcome a motion to dismiss. *See generally Oxford Asset Mgmt., Ltd. v. Jaharis,* 297 F.3d 1182, 1188 (11th Cir.2002) ("conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal"). Furthermore, the only specified acts of physical violence we can discern from the complaint involves pushing, shoving and having one's hair pulled. These acts do not constitute severe pain or suffering.

### CONCLUSION

We commend the district court for remembering that some minimal pleading standard does still exist and for that court's serious and thorough examination of the complaint. We affirm the district court's order dismissing Plaintiffs' complaint entirely, except we vacate the dismissal of Plaintiffs' claims—under the Alien Tort Act and the Torture Victim Protection Act—for alleged torture based on intentionally inflicted mental pain and suffering.

AFFIRMED IN PART, VACATED IN PART, REMANDED.

### APPENDIX

Angel Enrique Villeda Aldana 65341/2 Bell Gardens, CA 90201; Jorge Agustin Palma Romero, 10930 S. Borin Ave., Lennox, CA 90304; Oscar Leonel Guerra Evans, 3832 Royal Crest St., Apt. 4, Las Vegas, NE. 89119; Lyionhel McIntosh Rodriguez, 3940 San Andrews Pl., Los Angeles, CA 90062; Marel Martinez, 4412 Lockwood Ave., Los Angeles, CA 90029; Gumerzindo Loyo Matinez, 842 S. Normandie Ave., Apt. 20, Los Angeles, CA 90005; and Rigoberto Avayero Hernandez, 842 S. Normandie Ave., Apt. 20, Los Angeles, CA 90005, Plaintiffs,

v.

Fresh Del Monte Produce, Inc.

C/O 800 Douglas Road

North Tower, 12th Floor

Coral Gables, FL 33134,

Del Monte Fresh Produce Company

800 Douglas Road

North Tower, 12th Floor

Coral Gables, FL 33134,

and

Compania De Desarrollo Bananero De Guatemala, S.A. (Bandegua)

C/O 800 Douglas Road

North Tower, 12th Floor

Coral Gables, FL, 33134, Defendants.

Case No. 01-3399-CIV-Moreno/Dube.

United States District Court,

Southern District of Florida.

Feb. 5, 2003.

THIRD AMENDED COMPLAINT FOR EQUITABLE RELIEF AND DAMAGES; JURY TRIAL DEMANDED PER CURIAM.

### I. *NATURE OF THE ACTION*

1. Plaintiffs Angel Enrique Villeda Aldana, Jorge Agustin Palma Romero, Oscar

Leonel Guerra Evans, Lyionhel McIntosch Rodriguez, Marel Martinez, Gumerzindo Loyo Martinez and Rigoberto Alvayero Hernandez (hereafter referred to as "Plaintiffs" unless otherwise specified) bring this Complaint for equitable relief and for damages to remedy the injury to their persons caused by the wrongful conduct of the Defendants Fresh Del Monte Produce, Inc. ("Del Monte, Inc."), Del Monte Fresh Produce Company ("Del Monte Fresh"), and Compania de Desarrollo Banaero de Guatemala, S.A. ("Bandegua") (hereinafter collectively referred to as "Del Monte" or Defendants unless otherwise specified).

2. The claims in this action arise from Defendants' wrongful actions in connection with their banana production operations in Guatemala, which are conducted by Defendant Bandegua, a wholly-owned subsidiary of Defendant Del Monte, Inc. The individual Plaintiffs have been subjected to serious human rights abuses, including kidnapping, unlawful detention, and torture in violation of the Alien Tort Claims Act (ATCA), 28 U.S.C. § 1350, the Torture Victims Protection Act (TVPA), international human rights law, and the common tort law of the state of Florida. Further, Defendants engaged in a conspiracy to cause physical and mental harm to Plaintiffs in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 et seq.

3. Plaintiffs do not have access to an independent or functioning legal system within Guatemala to raise their complaints. They made every effort to utilize that system, but the perpetrators of the illegal actions against them remain free and at large in Guatemala, and have made ongoing threats of death to the Plaintiffs. The

Plaintiffs have sought refuge for themselves and their families in the United States. Having arrived in the United States in March 24, 2001, Plaintiffs Angel Enrique Villeda Aldana, Jorge Agustin Palma Romero, Oscar Leonel Guerra Evans, Lyionhel McIntosch Rodriguez and Marel Martinez have pursued the claims set forth herein within a reasonable time of gaining access to the courts of the United States. Similarly, Plaintiffs Gumerzindo Loyo Martinez and Rigoberto Alvayero Hernandez, who arrived in early 2002, have pursued their claim within a reasonable time of gaining access to the courts of the United States.

## II. JURISDICTION AND VENUE

4. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, the ATCA and the TVPA, 28 U.S.C. § 1350, for the alleged violations of international human rights law. Federal question jurisdiction is further based on violations of RICO, 18 U.S.C. § 1961 et seq. Supplemental jurisdiction exists over the state law causes of action pursuant to 28 U.S.C. § 1367. Federal jurisdiction also exists under 28 U.S.C. § 1332 based on diversity. Plaintiffs Angel Enrique Villeda Aldana, Lyionhel McIntosh Rodriguez, Marel Martinez, Gumerzindo Loyo Martinez and Rigoberto Alvaycro Hernandez reside in Los Angeles, California. Plaintiffs Jorge Agustin Palma Romero and Oscar Leonel Guerra Evans reside in Las Vegas, Nevada. Defendant Del Monte, Inc. is a corporation incorporated in the Cayman Islands with a principle place of business in Coral Gables, Florida. Defendant Del Monte Fresh is a corporation incorporated in Delaware with a principle place of business also in Coral Gables, Florida. Defendant Bandegua is, upon information and belief, a corporation incor-

porated under the laws of Guatemala, with a principle place of business in Coral Gables, Florida.

5. Venue properly lies in this Judicial District pursuant to 28 U.S.C. § 1391(b) and (c).

## III. *PARTIES*

### *Plaintiffs*

6. Plaintiff Angel Enrique Villeda Aldana is a citizen of Guatemala residing in Los Angeles, California. He brings this action for equitable relief and for damages to remedy the injuries to his person caused by the wrongful conduct of the Defendants, as more fully set forth herein.

7. Plaintiff Jorge Agustin Palma Romero is a citizen of Guatemala residing in Las Vegas, Nevada. He brings this action for equitable relief and for damages to remedy the injuries to his person caused by the wrongful conduct of the Defendants, as more fully set forth herein.

8. Plaintiff Oscar Leonel Guerra Evans is a citizen of Guatemala residing in Las Vegas, Nevada. He brings this action for equitable relief and for damages to remedy the injuries to his person caused by the wrongful conduct of the Defendants, as more fully set forth herein.

9. Plaintiff Lyionhel McIntosch Rodriguez is a citizen of Guatemala residing in Los Angeles, California. He brings this action for equitable relief and for damages to remedy the injuries to his person caused by the wrongful conduct of the Defendants, as more fully set forth herein.

10. Plaintiff Marel Martinez is a citizen of Guatemala residing in Los Angeles, California. He brings this action for equitable relief and for damages to remedy the injuries to his person caused by the wrongful conduct of the Defendants, as more fully set forth herein.

11. Plaintiff Gumerzindo Loyo Martinez is a citizen of Guatemala residing in Los Angeles, California. He brings this action for equitable relief and for damages to remedy the injuries to his person caused by the wrongful conduct of the Defendants, as more fully set forth herein.

12. Plaintiff Rigoberto Alvayero Hernandez is a citizen of Guatemala residing in Los Angeles, California. He brings this action for equitable relief and for damages to remedy the injuries to his person caused by the wrongful conduct of the Defendants, as more fully set forth herein.

### *Defendants*

13. Defendant Del Monte, Inc. is a for-profit company which distributes fresh produce throughout the United States and the world, specifically including within the state of Florida. Its principal place of business is located at 800 Douglas Road, North Tower, 12th Floor, Coral Gables, Florida 33134. Defendant Del Monte, Inc. has exclusive rights to market fresh produce under the Del Monte brand name.

14. Upon information and belief, Defendant Del Monte, Inc. owns, and through its Board of Directors, controls the family of companies operating under the Fresh Del Monte Produce name, through its Florida office located at 800 Douglas Road, North Tower, 12 Floor, Coral Gables, Florida 33134. According to the 20–F Report filed by Defendant Del Monte, Inc. on December 29, 2000 with the Securities and Exchange Commission, and other public sources, Defendant Del Monte, Inc. controls, manages or supervises all aspect of

production, distribution and marketing of its fresh produces on a worldwide basis.

15. Defendant Del Monte Fresh is a Delaware company with a principal place of business located at 800 Douglas Road, North Tower, 12th Floor, Coral Gables, Florida 33134. Del Monte Fresh is a wholly-owned subsidiary of Defendant Del Monte, Inc. and its address serves as Del Monte, Inc.'s principle executive office. Upon information and belief, Del Monte Fresh is under the direct supervision and control of its parent company, Del Monte, Inc. .

16. Defendant Bandegua is also a wholly-owned subsidiary of Defendant Del Monte, Inc., and is responsible, under the direct supervision and control of Defendant Del Monte, Inc. and/or Defendant Del Monte Fresh, for the production of bananas for distribution and sale by Defendant Del Monte, Inc.

17. Defendant Del Monte, Inc. for the purpose of attempting to shield itself from liability or responsibility for wrongful acts committed in furtherance of its business activities, created, or caused to have created, several wholly-owned subsidiaries, divisions and/or affiliated companies. These entities include, but are not limited to, Defendants Del Monte Fresh and Bandegua.

18. Defendant Del Monte, Inc. is fully liable for its own acts and the acts of any subsidiaries, affiliates, divisions or other entities directly or indirectly under its ownership and control, including Defendants Del Monte Fresh and Bandegua. Any such subsidiaries, affiliates, divisions or other entities are alter egos of Defendant Del Monte, Inc. or, alternatively, are in an agency relationship with it. Further, Defendant Del Monte, Inc. is vicariously liable under the doctrine of *respondeat superior* for the acts or omissions of any subsidiaries, affiliates, divisions or other entities under its ownership and control.

19. Upon information and belief, these subsidiaries including Del Monte Fresh and Bandegua were created for the sole purpose of achieving Del Monte, Inc.'s objectives with respect to the production, marketing, sale, and distribution of its fruit products, and are under the direct managerial and financial control of Del Monte, Inc. to the extent that such subsidiaries have no or insignificant financial assets of their own.

20. Regardless of whether Defendant Del Monte Fresh is found to be an alter ego or agent of Defendant Del Monte, Inc., Defendant Del Monte Fresh is fully liable for its own acts and the acts of any subsidiaries, affiliates, divisions or other entities directly or indirectly under its ownership and control, including Defendant Bandegua. Any such subsidiaries, affiliates, divisions or other entities are alter egos of Defendant Del Monte Fresh or, alternatively, are in an agency relationship with it. Further, Defendant Del Monte Fresh is vicariously liable under the doctrine of *respondeat superior* for the acts or omissions of any subsidiaries, affiliates, divisions or other entities under its ownership and control, including those of Defendant Bandegua.

21. Regardless of whether Defendant Bandegua is found to be an alter ego or agent of Defendants Del Monte, Inc. and/or Del Monte Fresh, Defendant Bandegua is liable for any and all wrongful acts done by it or on its behalf by any of its agents or employees.

## IV. BACKGROUND FACTUAL ALLEGATIONS

22. Defendant Del Monte, Inc. is one of the world's largest producers and distributors of bananas. One of its major sources of bananas is Guatemala. Through its wholly-owned subsidiaries, Defendants Del Monte Fresh and Bandegua, Del Monte, Inc. owns, leases and/or operates banana plantations in Guatemala. Among the plantations it owns and operates in Guatemala is the Zaculeu Lanquin Arapahoe Plantation in the Bobos District Municipality of Morales Izabal (hereinafter referred to as the "Bobos plantation").

23. In September and October, 1999, when the wrongful acts alleged herein occurred, the Bobos plantation was owned and operated by Bandegua through the General Manager employed by Bandegua, Jorge Arturo Osborne Escalante.

24. The workers at the Bobos plantation were represented by SITRABI, a national trade union of plantation workers affiliated to the International Union of Food, Agricultural, Hotel, Restaurant, Catering, Tobacco, and Allied Workers' Associations (hereinafter referred to as "IUF"). Plaintiffs, as is described more fully below, were all officers of SITRABI's union at the Bobos plantation.

25. Guatemala is widely known as a country that is struggling to maintain peace and reduce violence and armed conflict. However, the country also officially permits and regulates the use of private, armed security forces. The Ministry of Interior has specific jurisdiction to regulate these private security forces, and commonly allows them to operate.

26. Defendant Del Monte, Inc. and its wholly owned subsidiary, Bandegua, were engaged in negotiations with SITRABI for a new collective bargaining agreement covering the workers at the Bobos plantation. Defendant Del Monte, Inc. through its regional agents, including but not limited to Defendant Del Monte Fresh, was directly involved in these negotiations. Without legal justification, and in violation of the operative collective bargaining agreement, Defendants Del Monte, Inc., Del Monte Fresh, and Bandegua terminated 918 workers at the Bobos plantation, all of whom who were members of SITRABI.

27. In response to the illegal termination of 918 of its members who were employed at the Bobos plantation, SITRABI filed an appropriate complaint in the Labor Court of Guatemala and also continued in good faith its negotiations with Defendants.

## V. INJURIES AND HARM SUFFERED BY THE PLAINTIFFS

28. On or before October 13, 1999, Defendants Del Monte, Inc., Del Monte Fresh and Bandegua hired or otherwise created an agency relationship with an armed and organized security force (hereinafter referred to as the "security force") to use violence to intimidate the SITRABI leadership in order to affect the outcome of the ongoing collective bargaining negotiations and the associated labor disputes concerning the workforce of the Bobos plantation. This security force was given specific direction by employees or agents of Del Monte, Inc., Del Monte Fresh and/or Bandegua.

29. The security force was heavily armed and was permitted to operate openly due to the provisions and practices pursuant to the law of Guatemala under which

the Ministry of Interior regulates the creation and use of private, armed security forces. Moreover, public officials, at the urging of Defendants and/or their agents, intentionally failed to take action in order to permit the violence to occur. Further, various public officials were part of the security force.

30. On the afternoon of October 13, 1999, the security force met with employees and/or agents of Del Monte, Inc., Del Monte Fresh and/or Bandegua to plan violent action against the Plaintiffs and other SITRABI leaders. This meeting occurred at a restaurant in the Municipality of Morales Izabal. Among the Del Monte employees present was the Director of Operations, Teodoro Jiménez Falla, who, on information and belief, is still employed by Del Monte and working in Brazil after fleeing Guatemala to avoid criminal prosecution for his wrongful acts described herein. Also present and actively participating in planning the violence was Carlos Enrique Hernandez, who was head of security for Del Monte's operations in Guatemala. As is described below, Carlos Enrique Hernandez was present during the violent acts that followed the planning session described herein, and was relaying information as it occurred to allow his superiors at Del Monte to coordinate the steps of the plan to use violence to force the resignation of the SITRABI leaders from the union and from the company. On information and belief, the Bandegua General Manager, Jorge Arturo Osborne Escalante, was also present at this meeting, or it occurred at his direction and with his coordination.

31. Based on information and belief, the security force was represented at the meeting by its leaders, Obdulio Mendoza Matta, Edvin Mendoza Mata, Carlos Castro Garcies, and Carlos Régil Beker. At least two of these leaders, Obdulio Mendoza Matta and Carlos Castro Garcies, were contractors for Del Monte, Inc., Del Monte Fresh and/or Bandegua, and performed regular services in Guatemala as agents for the banana plantations owned by the Defendants.

32. The result of the meeting was a specific plan and agreement between the security force and Del Monte, Inc., Del Monte Fresh and/or Bandegua pursuant to which the security force would capture, kidnap and terrorize the Plaintiffs in order to break the SITRABI union, eliminate its experienced leadership, and gain a significant advantage in the ongoing collective bargaining negotiations and the associated labor disputes concerning the workforce of the Bobos plantation. This plan was in furtherance of the business activities and interests of Defendants Del Monte, Inc., Del Monte Fresh, and/or Bandegua, and constituted an express conspiracy to commit violent acts against the Plaintiffs.

33. On October 13, 1999, at 5:45 p.m. the security force, which was a gang of over 200 heavily armed men, came to the SITRABI headquarters in the Municipality of Morales, Izabal to carry out and implement the conspiracy, described in more detail below, on behalf of, and under the direction and control of, Defendants Del Monte, Inc., Del Monte Fresh, and/or Bandegua.

34. Plaintiffs Jorge Agustin Palma Romero and Oscar Leonel Guerra Evans were in the SITRABI office when the security force arrived. They were both detained unlawfully at gunpoint by the security force, and they were tortured with physical violence and the threat of death. The security force kept multiple weapons

pointed at them, frequently jabbing them with the weapons causing great physical pain and mental anguish. The aggressors threatened repeatedly that the Plaintiffs would be killed because of their activities on behalf of SITRABI.

35. Plaintiff Oscar Leonel Guerra Evans was eventually taken to a room within the SITRABI office and left with a subgroup of the security force. He was constantly tortured with guns and threats of death while he was detained against his will.

36. Plaintiff Jorge Agustin Palma Romero was forcibly detained and then removed from the SITRABI office at gunpoint by several leaders of the security force, including, but not limited to, Obdulio Mendoza Matta, Edvin Mendoza Mata, Carlos Castro Garcies, and Carlos Régil Beker. He was kidnapped by the security force in a car that belonged to SITRABI. He was ordered at gunpoint to show the security force where another of the Plaintiffs, and a leader of SITRABI, Plaintiff Marel Martinez, lived. During the drive, a leader of the security force, Obdulio Mendoza Matta, said to Plaintiff Jorge Agustin Palma Romero, while holding a gun to his head, that they were going to kill him and his body would be rotten by the time the human rights people heard that he is dead.

37. The security force arrived at the home of Plaintiff Marel Martinez, and in front of his wife and children, abducted him at gunpoint. They shoved him with gun barrels, smashed his cell phone, and told him that they were going to kill him, all while his family observed helplessly.

38. The security force took Plaintiff Marel Martinez and Plaintiff Jorge Agustin Palma Romero back to the SITRABI office, all the while again torturing them with guns and threats that they were going to be killed in a brutal and grotesque way. When they arrived back at the SITRABI office, the security force took them inside and, at gunpoint, forced Plaintiff Marel Martinez to telephone Plaintiff Angel Enrique Villeda Aldana, another SITRABI leader, and tell him he had to come at once to the SITRABI office to sort out a problem with Bandegua and the Bobos Chamber of Commerce. Marel Martinez had a gun to his head the entire time he made the call, and he was told that if he warned or otherwise failed to deliver the message to Plaintiff Angel Enrique Villeda Aldana, he would be killed instantly. The security force also forced Marel Martinez to call other SITRABI leaders and summon them to the office. While waiting for the other leaders to arrive, Plaintiffs Jorge Agustin Palma Romero, Oscar Leonel Guerra Evans, and Marel Martinez were subjected to ongoing torture as the security force members pointed guns at them and described how they were going to be killed.

39. At some point while the security force was waiting for Plaintiff Angel Enrique Villeda Aldana to arrive, Plaintiff Lyionhel McIntosch Rodriguez, another SITRABI leader, arrived at the SITRABI office. He was ordered at gunpoint by a leader of the security force, Obdulio Mendoza Matta, to get out of his car and go into the SITRABI office. Shortly thereafter, Plaintiff Angel Enrique Villeda Aldana arrived at the office and was likewise taken inside the SITRABI office at gunpoint.

40. Plaintiff Rigoberto Hernandez was at home when he received the call from Marel Martinez. He responded immediately and proceeded to the SITRABI offices. When Plaintiff Hernandez arrived at the union offices, he smiled upon seeing

his colleague, Marel Martinez. Obdulio Mendoza Matta then stepped forward and put a gun to Plaintiff Hernandez's head, threatening "I'll make you smile."

41. Plaintiff Gumerzindo Martinez was at home when he received a call from Marel Martinez; shortly thereafter, he boarded a bus heading in the direction of the SITRABI offices.

42. The bus, which contained about thirty five plantation workers and fifteen SITRABI leaders, was stopped in front of the SITRABI offices. Obdulio Mendoza Matta boarded the bus and explained to the passengers that he did not have a dispute with the workers but only the SITRABI leadership. SITRABI leaders, including Gumerzindo Martinez, were removed from the bus and led into the SITRABI offices, where they were forcibly held with the other leaders.

43. At this time, Obdulio Mendoza Matta jabbed a gun into Plaintiff Gumerzindo Martinez and told him that he was going to die. Obdulio Mendoza Matta then threatened Gumerzindo Martinez, exclaiming "Now you will find out who we really are. You won't mess with Bandegua after we cut your balls off and hang you!"

44. Once the seven SITRABI leaders, the Plaintiffs herein, were present, the security force took them, and other SITRABI members who were present in the office, to the auditorium of the union office. A leader of the security force, Carlos Castro Garcias, who claimed to be the President of the Chamber of Commerce for the Municipality of Morales, Izabal, told the Plaintiffs that they were responsible for the declining business in the area. Further, he said that if Del Monte abandons the Bobos plantation and the plantations in

the rest of the country, it would be their fault. He continued that the security force would not allow that to happen. At this point, another leader of the security force, Obdulio Mendoza Matta, interrupted to say that there had been enough talk and it was time to kill the SITRABI leaders, including the seven Plaintiffs herein.

45. Obdulio Mendoza Matta then ordered his men to "get the AK–47s." He then used a Polaroid camera and took pictures of the seven Plaintiffs, stating that he wanted a clear photo of the faces before he killed them all. The five Plaintiffs were shoved and jabbed with guns while the members of the security forces were discussing what to do next. The Plaintiffs all believed reasonably that they were going to be killed by the out of control mob. Another member of the security force, Mario Benildo Alvarez, grabbed Plaintiff Jorge Agustin Palma Romero by the hair and shouted, "Let's start with this one. Let's burn him alive. He's big and tall, let's kill Jorge." Obdulio Mendoza Matta then came from behind and hit Mr. Romero in the back, and said, "Do you want to see who wants to burn you alive you son of a bitch?"

46. The security force had become an unruly mob and the Plaintiffs were pushed and shoved with guns as the aggressors competed to shout what should be done to kill them. All of the Plaintiffs sustained injuries and suffered severe trauma as they waited to be brutally killed by the mob.

47. At some point in the confusion, the candidate for Mayor of Morales District, Manuel Sosa Castaneda, who is now the current Mayor of Morales Municipality, arrived. He was with the security force and joined in the mob action. Thereafter, the security force reached a consensus that

the two main leaders of SITRABI, Plaintiffs Angel Enrique Villeda Aldana and Marel Martinez, would be taken to a radio station owned by a leader of the security force, Carlos Castro Garcias, where they would be forced to denounce the union. Accompanied by Carlos Castro Garcias, Israel Vargas, who was Mayor of Morales District at the time of the events herein, and several other armed aggressors, Plaintiffs Angel Enrique Villeda Aldana and Marel Martinez were taken by force, at gunpoint, and against their wills, to the radio station. The remaining Plaintiffs were guarded by three gunmen who told them that if anyone moved, they would be killed.

48. On the way to the radio station, with guns to their heads and bodies, Plaintiffs Angel Enrique Villeda Aldana and Marel Martinez were further tortured and threatened with death. Carlos Castro Garcias took out a video camera and filmed much of the scene and taunted them, saying "they were not celebrities and would be giving their last messages."

49. At the radio station, Plaintiffs Angel Enrique Villeda Aldana and Marel Martinez were forced at gunpoint to make an announcement over the radio that the labor dispute with Del Monte was over, the workers should return to work, the workers who had been discharged from Bobos should get the money owed them and go elsewhere for work, and that the leaders of SITRABI would resign their posts.

50. When the announcement was completed, Plaintiffs Angel Enrique Villeda Aldana and Marel Martinez were taken back at gunpoint to the SITRABI office. The seven Plaintiffs herein, among others, were then gathered in an office and were

further tortured at gunpoint with threats of brutal death.

51. A lawyer from the area, Jorge Salguero, was brought in, and another man, Rufino Sosa, joined to type the lawyer's dictation. Another lawyer, who was clearly with the security force, was telling the other lawyer, Salguero, what to do. Two video cameras controlled by the security force were recording the events. A fax arrived in the office. On information and belief, the fax was sent by officials of Del Monte, Inc., Del Monte Fresh, and/or Bandegua. It was a model resignation and release form. The lawyers directed the typist who prepared a resignation and release letter for the seven Plaintiffs and the four additional SITRABI leaders. They were all forced, at gunpoint, to sign the resignation letters. During all of these events, the Chief of Security for Del Monte, Inc., Del Monte Fresh, and/or Bandegua, Carlos Enrique Hernandez Diaz, was present and was communicating by walkie talkie to persons believed to be management staff of Del Monte.

52. Once the letters were signed, then again unruly calls from the mob of the security force were made to kill the Plaintiffs. Manuel Sosa Castaneda, a leader of the security force and now the Mayor of Morales Municipality, made a speech mocking the Plaintiffs and thanking them for their public service of resigning from Del Monte. He had been one of the armed aggressors throughout the events of the evening.

53. Plaintiffs Marel Martinez and Jorge Agustin Palma Romero made statements to the mob to the effect that "you have what you wanted, now please let us go."

54. Obdulio Mendoza Matta, a leader of the security force, told the Plaintiffs that

 

they had better leave the area or he would find them and kill them. He further stated that even if they went to Mexico, he would find them. He pounded Plaintiffs Angel Enrique Villeda Aldana and Jorge Agustin Palma Romero in the chest as he was saying this.

55. Plaintiffs were released from their detention around 2 a.m. on October 14, 1999. As they walked outside, they all were able to see the National Police office, which was no more than 100 meters from the SITRABI office. It was an absolute certainty that the National Police were aware of all of the events of the night, and yet they did nothing to intervene to protect the SITRABI leaders. Positive that they would not be safe if they remained in the area, the Plaintiffs, except Gumerzindo Martinez, gathered their families and fled to Guatemala City where they sought police protection.

56. Plaintiff Gumerzindo Martinez, who was forced to remain in the area of the Bobos plantation due to a motorcycle accident, ran into Obdulio Mendoza Matta at a gas station four days later. Obdulio Mendoza Matta again told Plaintiff Gumerzindo Martinez that he was to leave the country immediately or face certain death. He thereafter fled the area and hid in the countryside until he managed to travel to Guatemala City.

57. At the conclusion of the events of the evening of October 13 and the early morning of October 14, 1999, Obdulio Mendoza Matta had custody of the resignation letters of the five Plaintiffs. The next day, in response to an inquiry from the Ministry of Labor, the Bandegua General Manager, Jorge Arturo Osborne Escalante, asserted that he had the "voluntary resignations" of the SITRABI leaders in his possession. Mr. Escalante made this statement at a meeting with the Ministry of Labor and at a separate meeting with the Public Ministry. The Plaintiffs were present in the meeting with the Ministry of Labor.

58. Within weeks of the events of October 13 and 14, two of the main leaders of the security force, Obdulio Mendoza Matta and Carlos Castro Garcias, who had been contractors and agents for Del Monte, Inc., Del Monte Fresh, and/or Bandegua, were rewarded by Del Monte, Inc. for their leadership roles in the violence described herein with favorable long term leases and became the administrators for banana plantations in Guatemala that Del Monte, Inc. had decided not to operate directly any longer.

59. Shortly after the events described herein, senior management for Del Monte, in response to demands made by the IUF, promised to remove Obdulio Mendoza Matta and Carlos Castro Garcias, and others who had been involved in the violence of October 13 and 14, from management positions at any Del Monte-controlled plantation in Guatemala. Further, acknowledging the ongoing danger to their lives and the lives of their families, Del Monte promised to assist the five Plaintiffs to get out of Guatemala. Ultimately, Del Monte provided $50,000 to the IUF dedicated to covering the costs of relocating Plaintiffs Angel Enrique Villeda Aldana, Jorge Agustin Palma Romero, Oscar Leonel Guerra Evans, Lyionhel McIntosch Rodriguez and Marel Martinez and their families. These funds were for travel costs only, and these five Plaintiffs in no way indicated that these funds applied to settle any claims that could be brought against Del Monte for its acknowledged direct role in the events of October 13 and

14, 1999. Plaintiffs Gumerzindo Martinez and Rigoberto Hernandez received no such funds.

60. In March 2001, Plaintiffs Angel Enrique Villeda Aldana, Jorge Agustin Palma Romero, Oscar Leonel Guerra Evans, Lyionhel McIntosch Rodriguez and Marel Martinez, after being forced to live in hiding and in constant fear of their lives, and the lives of their family members, for 17 months, were relocated to the United States with the direct intervention of the U.S. embassy in Guatemala. Plaintiffs Gumerzindo Martinez and Rigoberto Hernandez were not able to flee Guatemala until almost a year later, in early 2002.

## VI. DEFENDANTS' VIOLATIONS OF LAW

61. Defendants' actions violate, and Plaintiffs' causes of action arise from, the following laws, agreements, conventions, resolutions and treaties, which constitute specific examples of the applicable law of nations or customary international law:

(a) Alien Tort Claims Act, 28 U.S.C. § 1350;

(b) Torture Victim Protection Act, 28 U.S.C. § 1350;

(c) Common law of the United States of America;

(d) United Nations Charter, 59 Stat. 1031, 3 Bevans 1153 (1945);

(e) Universal Declaration of Human Rights, G.A. Res. 217A(iii), U.N. Doc. A/810 (1948);

(f) International Covenant on Civil and Political Rights, G.A. Res. 2220A(xxi), 21 U.N. Doc., GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966);

(g) Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. res.

39/46, 39 U.N. Doc., GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51 (1984)(ratified 10/28/98);

(h) Declaration on the Protection of All Persons From Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 3452, 30 U.N. Doc., GAOR Supp. (No. 34) at 91, U.N. Doc. A/10034 (1976);

(i) Vienna Declaration and Programme of Action (World Conference on Human Rights, 1993);

(j) International Labor Organization Conventions 87 and 98, which protect the fundamental rights to associate and organize; and

(k) Statutes and common law of the State of Florida, including but not limited to, assault and battery, false imprisonment, kidnapping, negligence, recklessness, intentional infliction of emotional distress, and negligent infliction of emotional distress.

## VII. DEFENDANTS' VICARIOUS LIABILITY

62. Defendant Del Monte, Inc. controls and operates a number of wholly owned subsidiaries, including, but not limited to, Defendants Del Monte Fresh and Bandegua. As the owner of its wholly owned subsidiaries, Defendant Del Monte, Inc. is jointly and severally liable for all of the tortious actions committed by any of its subsidiaries when such subsidiaries were acting in concert with any other person or entity in furtherance of Del Monte, Inc.'s business interests and activities. All of the wrongful acts alleged herein were committed by individuals who were acting within the course and scope of a business relationship with Del Monte, Inc. with the advance knowledge, acquiescence or subsequent ratification of Del Monte, Inc.

63. Defendant Del Monte, Inc. acting by and through its subsidiaries Defendant Del Monte Fresh and/or Bandegua, hired, contracted with, or otherwise retained as agents the individuals who committed the violent acts against Plaintiffs, as described herein. The individuals who committed the violent acts against Plaintiffs were acting as agents of Del Monte, Inc., Del Monte Fresh, and/or Bandegua, and committed the tortious actions described in this Complaint in connection with and in furtherance of Del Monte, Inc.'s business interests and activities. In committing these tortious actions, the individual agents were acting within the course and scope of the agency relationship with Del Monte, Inc. with Del Monte, Inc.'s advance knowledge, acquiescence or subsequent ratification. Defendant Del Monte, Inc. is therefore vicariously liable for all of the tortious actions committed by its agents done in connection with and in furtherance of its business interests and activities in Guatemala as described herein.

64. With respect to all of the causes of action described below, the harm to Plaintiffs was either caused directly by the acts or omissions of Defendants or was caused by the acts or omissions of Defendants' wholly owned subsidiaries, making Defendants jointly and severally liable, or by the acts or omissions of Defendants' agents, making Defendants vicariously liable.

## VIII. *CAUSES OF ACTION*

### *First Cause of Action*

The Alien Tort Claims Act, 28 U.S.C. § 1350 For Torture, Kidnapping, Unlawful Detention, and Crimes Against Humanity

65. Plaintiffs incorporate by reference paragraphs 1 through 64 of this Complaint as if set forth herein.

66. Defendants' acts and omissions of intentionally and tortiously hiring and directing its employees and/or agents to kidnap, unlawfully detain, torture, and cruelly threaten with death some or all of the Plaintiffs herein resulted in serious human rights abuses against all Plaintiffs. These acts violate the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 61, *supra.* The acts described herein are actionable under the ATCA, and, if such a showing is required, were done with the complicity of state actors. In acting together with its agent, the security force permitted to exist and openly operate under the laws of Guatemala, and assisted by government officials of the Bobos District, Defendants acted under color of law in violating each of the applicable laws, agreements, conventions, resolutions and treaties listed in paragraph 61, *supra.* Further, the Government of Guatemala fails to enforce its laws that would prevent or remedy the violations alleged herein.

67. Plaintiffs were all subjected to being physically attacked, threatened constantly with death and serious bodily injury while being held captive at gunpoint, and other forms of brutality and cruelty. These acts were inflicted intentionally and with malice to cause Plaintiffs severe mental and physical pain and suffering, and to have the lasting effect of forever causing Plaintiffs to live in fear of being subjected to similar acts. These acts amounted to torture and violate the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws,

agreements, conventions, resolutions and treaties listed in paragraph 61, *supra*.

68. All of the Plaintiffs were forcibly captured and detained by employees and/or agents of Defendants, and were held against their will for a lengthy period of time. These removals and detentions were done intentionally and with malice to cause Plaintiffs severe mental and physical pain and suffering. These acts amounted to kidnapping and unlawful detention and violate the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 61, *supra*.

69. Defendants committed, through their employees and/or agents acts that had the intent and the effect of grossly humiliating and debasing all of the Plaintiffs, forcing them to act against their will and conscience, inciting fear and anguish, and breaking their physical and/or moral resistance. Plaintiffs were placed in great fear for their lives and forced to suffer severe physical and psychological abuse and agony. The acts described herein constitute cruel, inhuman or degrading treatment in violation of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 61, *supra*.

70. Defendants' conduct in violation of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 61, *supra*, has caused Plaintiffs significant injury. Defendants are jointly and severally liable for the acts of any and all subsidiaries that are in violation of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 61, *supra*. Defendants are also vicariously liable for any violations of their employees or agents of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 61, *supra*. Plaintiffs are entitled to injunctive relief and to recover compensatory and punitive damages in amounts to be ascertained at trial.

*Second Cause of Action*

The Torture Victim Protection Act, 28 U.S.C. § 1350 For Torture and Extrajudicial Killing

71. Plaintiffs incorporate by reference paragraphs 1 through 70 of this Complaint as if set forth herein.

72. Defendants' acts and omissions of intentionally and tortiously hiring and directing its employees and/or agents to torture the Plaintiffs and threaten with them with death were inflicted intentionally and with malice to cause Plaintiffs severe mental and physical pain and suffering. These acts amounted to torture for purposes of the TVPA, violate the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 61, *supra*. In addition, that Defendants employees and/or agents threatened Plaintiffs with extrajudicial killing, and created a concrete fear in Plaintiffs that they would be killed, is actionable as an attempted extrajudicial killing under the TVPA. In acting together with its agent, the security force per-

mitted to exist and openly operate under the laws of Guatemala, and assisted by the government officials of the Municipality of Morales Izabal, Defendants acted under color of law in violating each of the applicable laws, agreements, conventions, resolutions and treaties listed in paragraph 61, *supra.* Further, the Government of Guatemala fails to enforce its laws that would prevent or remedy the violations alleged herein.

73. Defendants' conduct in violation of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 61, *supra,* has caused Plaintiffs significant injury. Defendants are jointly and severally liable for the acts of any subsidiaries that are in violation of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 61, *supra.* Defendants are also vicariously liable for any violations of their employees or agents of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 61, *supra.* Plaintiffs are entitled to injunctive relief and to recover compensatory and punitive damages in amounts to be ascertained at trial.

### Third Cause of Action

The Alien Tort Claims Act, 28 U.S.C. § 1350 For Denial of Fundamental Rights to Associate and Organize

74. Plaintiffs incorporate by reference paragraphs 1 through 73 of this Complaint as if set forth herein.

75. Defendants committed, or acted in concert to commit, or Defendants' co-venturers or agents committed violent acts against Plaintiffs, described fully in the preceding paragraphs. This violence was intentionally designed and carried out to deny Plaintiffs and their colleagues in SITRABI their fundamental rights to associate and organize, and did in fact result in the denial of these rights.

76. The acts described herein constitute violations of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 61, *supra.* The acts described herein are actionable under the ATCA, and, if such a .showing is required, were done with the complicity of state actors. In acting together with its agent, the security force permitted to exist and openly operate under the laws of Guatemala, and assisted by the government officials of the Municipality Morales Izabal, Defendants acted under color of law in violating each of the applicable laws, agreements, conventions, resolutions and treaties listed in paragraph 61, *supra.* Further, the Government of Guatemala fails to enforce its laws that would prevent or remedy the violations alleged herein.

77. Defendants' conduct in violation of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 61, *supra,* has caused Plaintiffs significant injury. Defendants are jointly and severally liable for the acts of any subsidiaries that are in violation of the law of nations, customary international law, and world-

wide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 61, *supra.* Defendants are also vicariously liable for any violations of their employees and/or agents of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 61, *supra.* Plaintiffs are entitled to injunctive relief and to recover compensatory and punitive damages in amounts to be ascertained at trial.

*Fourth Cause of Action*

RICO Violations 18 U.S.C. § 1961 *et seq.*

78. Plaintiffs incorporate by reference paragraphs 1 through 77 of this Complaint as if set forth herein.

79. Defendant Del Monte, Inc. is a person within the meaning of 18 U.S.C. § 1961(3). Defendants Del Monte, Inc., Del Monte Fresh and/or Bandegua, and the security force collectively as an association, in fact constitute an enterprise (hereafter referred to as the "Bandegua Enterprise") within the meaning of 18 U.S.C. § 1961(4). In violation of 18 U.S.C. § 1962(c), Defendant Del Monte, Inc. or Del Monte Fresh through its employees and agents has conducted, and continues to conduct, the affairs of the Bandegua Enterprise through a pattern of racketeering activity consisting of multiple acts and threats of murder, kidnapping and extortion, as set forth specifically in Paragraphs 28 through 58. The purpose of this conspiracy was to give Defendant Del Monte, Inc. and/or Del Monte Fresh a financial advantage through the nullification of con-

tractual and statutory rights of its employees on the Bobos plantation. This would increase Del Monte's revenues and profits.

80. In violation of 18 U.S.C. § 1962(d), Defendant Del Monte, Inc., Del Monte Fresh and/or Bandegua has conspired, and continues to conspire, to violate 18 U.S.C. § 1962(c). As a result of this unlawful conspiracy, Plaintiffs were all subjected to being physically attacked, threatened constantly with death and serious bodily injury while being held captive at gunpoint, and other forms of brutality and cruelty. These acts were inflicted intentionally and with malice to cause Plaintiffs severe mental and physical pain and suffering, and to have the lasting effect of forever causing Plaintiffs to live in fear of being subjected to similar acts. They are entitled to compensatory and punitive damages, as well as statutory damages under RICO, including treble damages, as well as injunctive relief, in an amount to be determined at trial.

*Fifth Cause of Action*

Battery

81. Plaintiffs incorporate by reference paragraphs 1 through 80 of this Complaint as if set forth herein.

82. Defendants committed, or acted in concert to commit, or Defendants' employees or agents committed acts which resulted in harmful or offensive contact with the bodies of Plaintiffs. Plaintiffs did not consent to the contact, which caused injury, damage, loss and harm to each of the Plaintiffs.

83. The acts described herein constitute battery, actionable under the laws of Florida, the laws of the United States and the laws of Guatemala.

 

### Sixth Cause of Action

### Assault

84. Plaintiffs incorporate by reference paragraphs 1 through 83 of this Complaint as if set forth herein.

85. Defendants committed, or acted in concert to commit, or Defendants' employees or agents committed acts which caused Plaintiffs to be apprehensive that Defendants would subject them to imminent batteries and/or intentional invasions of their rights to be free from offensive and harmful contact, and said conduct demonstrated that Defendants had a present ability to subject Plaintiffs to an immediate, intentional, offensive and harmful touching. Plaintiffs did not consent to such conduct, which caused injury, damage, loss and harm to each of the Plaintiffs.

86. The acts described herein constitute assault, actionable under the laws of the Florida, the laws of the United States and the laws of Guatemala.

### Seventh Cause of Action

### Arbitrary Arrest and Detention

87. Plaintiffs incorporate by reference paragraphs 1 through 86 of this Complaint as if set forth herein.

88. Defendants committed, or acted in concert to commit, or Defendants' employees or agents committed acts which caused Plaintiffs to be arrested and detained. Such arrest and detention of Plaintiffs was illegal and unjust, carried out without a warrant, probable cause, reasonable suspicion or notice of charges.

89. Plaintiffs were placed in fear for their lives, were deprived of their freedom, separated from their families and forced to suffer severe physical and mental abuse. Plaintiffs did not consent to such conduct, which caused injury, damage, loss and harm to each of them.

90. The acts described herein constitute arbitrary arrest and detention, actionable under the laws of Florida, the laws of the United States, and the laws of Guatemala.

### Eighth Cause of Action

### False Imprisonment

91. Plaintiffs incorporate by reference paragraphs 1 through 90 of this Complaint as if set forth herein.

92. Defendants committed, or acted in concert to commit, or Defendants' employees or agents committed acts to unlawfully exercise force or the express or implied threat of force to restrain, detain or confine Plaintiffs. The restraint, detention or confinement compelled Plaintiffs to stay or go somewhere against their will for some appreciable time.

93. Plaintiffs were placed in fear for their lives, were deprived of their freedom, separated from their families and forced to suffer severe physical and mental abuse. Plaintiffs did not consent to such conduct, which caused injury, damage, loss and harm to each of them.

94. The acts described herein constitute false imprisonment, actionable under the laws of Florida, the laws of the United States, and the laws of Guatemala.

### Ninth Cause of Action

### Intentional Infliction of Emotional Distress

95. Plaintiffs incorporate by reference paragraphs 1 through 94 of this Complaint as if set forth herein.

96. The acts described herein constitute outrageous conduct against Plaintiffs, and were without privilege.

97. Defendants committed, or acted in concert to commit, or Defendants' employees or agents committed acts which intended to cause Plaintiffs to suffer emotional distress. In the alternative, Defendants engaged in the conduct with reckless disregard of the probability of causing Plaintiffs to suffer emotional distress, Plaintiffs were present at the time the outrageous conduct occurred, and Defendants knew that the Plaintiffs were present.

98. Plaintiffs suffered severe emotional distress, and the outrageous conduct of Defendants was a cause of the emotional distress suffered by Plaintiffs.

99. Defendants' outrageous conduct constitutes the intentional infliction of emotional distress and is actionable under the laws of Florida and the laws of the United States.

### Tenth Cause of Action

Negligent Infliction of Emotional Distress

100. Plaintiffs incorporate by reference paragraphs 1 through 99 of this Complaint as if set forth herein.

101. At all relevant times, Defendants, and each of them, owed Plaintiffs a duty to act with reasonable care, and at all relevant times, harm and/or injury to the Plaintiffs was reasonably foreseeable if such duty of care was breached.

102. At all relevant times, Defendants, and each of them, had the power, ability, authority and duty to stop engaging in the conduct described herein and to intervene to prevent or prohibit such conduct.

103. At all relevant times, Defendants, and each of them, knew, or reasonably should have known, that the conduct described herein would and did proximately result in physical and emotional distress to Plaintiffs.

104. Despite said knowledge, power, and duty, Defendants, and each of them, breached their duty to Plaintiffs, and thereby negligently failed to act so as to stop engaging in the conduct described herein and to prevent or to prohibit such conduct or to otherwise protect Plaintiffs. To the extent that said negligent conduct was perpetrated by employees or agents of Defendants, the Defendants confirmed and ratified said conduct with the knowledge that Plaintiffs' emotional and physical distress would thereby increase and with a wanton and reckless disregard for the deleterious consequences to Plaintiffs.

105. As a direct and legal result of Defendants' wrongful acts, Plaintiffs have suffered and will continue to suffer significant physical injury, pain and suffering and extreme and severe mental anguish and emotional distress.

106. Defendants' conduct constitutes the negligent infliction of emotional distress and is actionable under the laws of Florida, and the laws of the United States.

### Eleventh Cause of Action

Negligence Per Se

107. Plaintiffs incorporate by reference paragraphs 1 through 106 of this Complaint as if set forth herein.

108. Defendants failed to use ordinary or reasonable care in order to avoid injury to the Plaintiffs. Defendants' negligence

was a cause of injury, damage, loss and harm to Plaintiffs.

109. As a result of these acts, Plaintiffs suffered harm including, but not limited to, physical harm, pain and suffering, and severe emotional distress. Defendants' conduct constitutes negligence and is actionable under the laws of Florida, the United States, Guatemala, the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 61, *supra.*

### *Twelfth Cause of Action*

### Aiding and Abetting

110. Plaintiffs incorporate by reference paragraphs 1 through 109 of this Complaint as if set forth herein.

111. Defendants knowingly provided substantial assistance to its agents and/or employees, including the security force that committed the wrongful acts delineated in the preceding eleven causes of action at ¶¶ 65—109 at the time such wrongful acts were perpetrated.

112. Defendants' aiding and abetting the wrongful acts delineated in the preceding eleven causes of action at ¶¶ 65—109 is actionable under the laws of Florida.

### IX. *DEMAND FOR JURY TRIAL*

113. Plaintiffs demand a trial by jury on all issues so triable.

### X. *PRAYER FOR RELIEF*

WHEREFORE, Plaintiffs respectfully request the Court to:

(a) enter judgment in favor of Plaintiffs on all counts of the Complaint;

(b) declare that Defendants have violated Plaintiffs' human rights and the laws of the State of Florida and the United States, as set forth herein;

(c) award Plaintiffs compensatory and punitive damages, as well as statutory damages and treble damages under RICO;

(d) grant Plaintiffs equitable relief, permanently enjoining Defendants from further engaging in human rights abuses against Plaintiffs and their fellow members of SITRABI;

(e) award Plaintiffs the costs of suit including reasonable attorneys' fees, and

(f) award Plaintiffs such other and further relief as the Court deems just under the circumstances.

Terry Collingsworth

D.C. Bar No. 471830

Natacha Thys

D.C. Bar No. 458143

International Labor Rights Fund Washington, D.C., for Plaintiffs.

Robert Sugarman

Florida Bar No. 149–388

Sugarman & Susskind

Coral Gables, FL, for Plaintiffs.