Ana Patricia **CHAVEZ**, Cecilia Santos, Jose Francisco Calderon, Erlinda Revelo, and Daniel Alvarado, Plaintiffs,

v.

Nicolas **CARRANZA**, Defendant.

No. 03–2932 Ml/P.

United States District Court,
W.D. Tennessee,
Western Division.

Oct. 26, 2005.

Carolyn Patty Blum, Center for Justice & Accountability, New York, NY, David R. Esquivel, Bass Berry & Sims PLC, Nashville, TN, Matthew J. Eisenbrandt, Center for Justice & Accountability, San Francisco, CA, for Plaintiffs.

Nicolas Carranza, Memphis, TN, pro se.

Robert M. Fargarson, Neely Green Fargarson Brooke & Summers, Memphis, TN, for Defendant.

## ORDER DENYING IN PART AND GRANTING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

MCCALLA, District Judge.

Before this Court is Plaintiffs' Motion for Summary Judgment, filed June 24, 2005. Defendant responded in opposition on July 27, 2005, and Plaintiffs filed a reply on October 13, 2005. For the reasons set forth below, Plaintiffs' motion is GRANTED in part and DENIED in part.

### I. Background and Relevant History

Plaintiffs, who are or were at all pertinent times citizens of El Salvador, filed their original complaint in this action pursuant to the Torture Victims Protection Act ("TVPA"), Pub.L. No. 102–256, 106 Stat. 73 (enacted March 12, 1992) (codified as Note to 28 U.S.C. § 1350), and the Alien Tort Claims Act ("ATCA"), 28 U.S.C.

§ 1350, on December 10, 2003. Plaintiffs filed an Amended Complaint on July 29, 2004, and a Second Amended Complaint on June 20, 2005. On September 30, 2004, the Court denied Defendant's motion to dismiss and renewed motion to dismiss, and on October 18, 2005, it denied Defendant's motion for judgment on the pleadings, or in the alternative, for summary judgment.

According to Plaintiffs, Defendant, Nicolas Carranza, served as El Salvador's Subsecretary of Defense and Public Security, from about October, 1979, until January, 1981, during which time he "exercised command and control over the three units of the Salvadoran Security Forces—the *Guardia Nacional* ('National Guard'), *Policia Nacional* ('National Police'), and *Policia de Hacienda* ('Treasury Police')." (Second Am. Compl. ¶¶ 2–3.) He served as Director of the Treasury Police from about June, 1983, until May, 1984, during which time he "possessed and exercised command and control over the Treasury Police." (*Id.* ¶ 3.) Plaintiffs' Second Amended Complaint alleges that Mr. Carranza "exercised command responsibility over, conspired with, or aided and abetted subordinates in the Security Forces of El Salvador, or persons or groups acting in coordination with the Security Forces or under their control, to commit acts of extrajudicial killing, torture, and crimes against humanity, and to cover up these abuses." (Second Am. Compl. ¶ 2.) Defendant has resided in the United States since 1984 and is currently a resident of Memphis, Tennessee.

Plaintiffs claim that Defendant bears command responsibility for certain predicate acts—namely, the torture, extrajudicial killing, and crimes against humanity that Plaintiffs and their family members have allegedly suffered. (Pls.' Mot. Summ. J., at 1.) The doctrine of command

responsibility requires that Plaintiffs prove (1) the occurrence of each predicate act and (2) that Defendant is liable as the commander of those who perpetrated the acts. (*Id.* at 1–2.) Plaintiffs seek summary judgment on the predicate acts of torture and extrajudicial killing under the TVPA and the ATCA. They argue that there is "overwhelming evidence in the record" to support these claims. In addition, by granting summary judgment, "the Court will narrow the complex body of facts and law that the jury will be required to consider at trial and thereby promote trial efficiency." (*Id.* at 1.)

## II. Undisputed Facts

The facts underlying Plaintiffs' claims are largely undisputed. Plaintiff Ana Maria Chavez ("Chavez") is a citizen of El Salvador, a legal permanent resident of the United States and a current resident of California. (Second Am. Compl. ¶ 8.) On July 26, 1980, Chavez, her partner, Carlos Omar Reyes, and her infant daughter were at Chavez's parents' home in El Salvador for a visit. Her parents, Guillermina and Humberto Chavez, were school teachers and members of the teachers' union in Ahuachapan, El Salvador. That morning, Chavez saw "in the corridor of the house a man dressed in civilian clothes, wearing a mask, and carrying a rifle." This individual grabbed Chavez's mother and threw her on the bed. More armed men, dressed similarly, entered the house. One threw Chavez on the bed next to her mother. The men beat Chavez's mother, and opened "all the drawers in the bedroom wardrobe, and demanded to see propaganda and money." Chavez and her infant daughter were taken to another room, where Chavez could hear her mother's continued beating, and then gunshots. Once it was quiet, Chavez left the room and found that her mother had been killed. She subsequently found her partner at the neighbor's house and her father in the

corridor of her parents' home. Both had been shot. (Def.'s Resp. Pls.' Statement Mat. Facts ("Def.'s Resp. Pls.' SOMF") ¶¶ 2–11.)

Cecilia Santos ("Santos") is a native of El Salvador, a naturalized citizen of the United States, and a resident of New York. (Second Am. Compl. ¶ 9.) According to the undisputed facts, Santos was a student at the National University of El Salvador and worked full-time for the Salvadoran Ministry of Education in 1980. On September 25, 1980, Santos was in the restroom at a shopping mall in San Salvador when she heard a loud noise that sounded like an explosion. Two private security guards entered the restroom and began questioning Santos about the sound. They subsequently took Santos to an office in the mall and "accused her of having planted a bomb, offering what appeared to be a box of cigarettes as proof." An individual in the office made a telephone call, and thirty minutes later, "two men dressed in civilian clothes came to the office and took Ms. Santos away in a taxi." (Def.'s Resp. Pls.' SOMF ¶¶ 16–22.)

After driving for approximately twenty minutes, they reached the headquarters of the National Police, whereupon Santos was "turned over to the Corporation of National Investigation," a subsection of the National Police agency. Santos was blindfolded, led through a tunnel, and "crossed a larger room where she heard the sounds of many people moaning and groaning on the floor." Santos was seated in a room with several men in it and was told, "[i]t will be easy if you cooperate with us." One of the men interrogated Santos, asking her about her family members, coworkers and classmates. Another "groped her by pressing on her breasts and legs, and trying to put his hand inside her blouse and skirt[;] later ... one of her interrogators pulled her partially out of

the chair and forced an object into her vagina." Santos screamed in pain, to which one of the men replied, "[t]hat's nothing. That's just to test." Another said, "[d]o you remember where you are? This is the National Police Headquarters, and here we decide what is going on, what can ... happen to you." An interrogator inquired whether Santos knew how to make a bomb and told her that she had to know, since she was in the University. "The man dipped a Q–Tip into a bottle of sulphuric acid and inserted it into Ms. Santos' nose. He also dropped acid onto Ms. Santos' right hand, which caused it to blister almost immediately." Later, "while one man monitored her heart rate with a stethoscope, another man attached wires around the fingers of Ms. Santos' right hand and administered electric shocks." (Def.'s Resp. Pls.' SOMF ¶¶ 23–37.)

During the interrogation, the men placed pictures of different individuals before Santos and asked her to identify them. She later signed a blank piece of paper, "with the assistance of one of her interrogators." After her interrogation ended, one of the men who had been questioning her took her "to a man in a green uniform, who was to place her in a cell." Her interrogator instructed the man that Santos "is in the deposit of the Ministry of Defense." (Def.'s Resp. Pls.' SOMF ¶¶ 38–41.)

Plaintiff Jose Francisco Calderon ("Calderon") is a native of El Salvador, a naturalized citizen of the United States, and a resident of California. (Second Am. Compl. ¶ 10.) According to Plaintiffs' un-

disputed statement of facts, Calderon's father ("Paco") was a school principal and, like Chavez's parents, a member of the teachers' union in Ahuachapan, El Salvador. In June 1980, Calderon's father was arrested for possession of flyers that "instructed the population about what to do in the event of a general strike or a natural disaster." Calderon testified that "when you have one of those flyers, the army sees you as a subversive." (Calderon Dep., Pls.' Mem. Supp. Mot. Summ. J. Ex. E at 18.) Upon his release, Plaintiff Calderon's father moved in with Calderon in San Salvador. On September 11, 1980, uniformed members of the National Police wearing bulletproof vests came to Calderon's house and demanded entry. Calderon opened the door, and "several men in civilian clothes entered the house." One of the men, "was wearing a mask and carried a G3 military-issued rifle," forced Calderon on the floor, stepped on him and pointed the rifle at his back. The men also detained Calderon's father, at which point they "broke the light bulbs in the living room, then fired five gunshots from the G3 rifles into Paco Calderon's body." Calderon "thought that he would be shot next," but the men left. (Def.'s Resp. Pls.' SOMF ¶¶ 42–55.)

Plaintiff Erlinda Revelo, ("Revelo")[1] is a citizen and current resident of El Salvador. (Second Am. Compl. ¶ 11.) According to Plaintiffs,[2] Revelo's husband, Manuel Franco, was a professor at the National University in El Salvador and a prominent leader of the Democratic Revolutionary

---

1. Revelo originally brought her claims under a pseudonym, Jane Doe. Her husband's pseudonym was James Doe. The Court granted Plaintiffs' Unopposed Motion Regarding Use of Pseudonyms and to Unseal Documents Filed Under Seal on September 19, 2005.

2. Plaintiffs rely largely on the findings of fact set forth in the Report of the United Nations

Truth Commission on El Salvador ("Truth Commission Report" or "Report"), dated April 1, 1993. The Truth Commission on El Salvador was charged with investigating acts of violence that took place during the country's civil war from 1980 to 1991. (See Truth Comm'n Report, Pls.' Mem. Supp. Mot. Summ. J. Ex. B ("Truth Comm'n Report") at PL0009.)

Front (FDR) in 1980. On November 27, 1980, Revelo's husband and five other FDR leaders were abducted "in a military operation in which the perimeter of the school was secured by the Treasury Police." Franco's body was later dumped on the side of the road on the outskirts of Apulo, El Salvador. When Revelo identified her husband's body, she observed gunshot wounds to her husband's mouth and thorax, as well as "a well-defined burn surrounding his entire neck." (Def.'s Resp. Pls.' SOMF ¶¶ 56–63.)

Plaintiff Daniel Alvarado ("Alvarado")[3] is a native of El Salvador, is not a United States citizen, and has resided in Sweden since 1986. (Second Am. Compl. ¶ 12; Pls.' Resp. Def.'s SOMF ¶ 4.) Alvarado was abducted in August 1983 by men dressed in civilian clothes and carrying military-issued rifles. He was taken to the Treasury Police headquarters, and placed in a cell. The men connected wires to Alvarado's toes and ran an electric current through his body. They also placed a hood over his head and beat him. The men accused Alvarado "of being a guerrilla fighter" and that he was responsible for the death of Lt. Cmdr. Albert Schaufelberger, a United States military advisor in El Salvador. Alvarado alleges that the individual in charge was Major Ricardo Pozo, the chief of the intelligence section of the Treasury Police and the head of the official Salvadoran investigation into Lt. Cmdr. Schaufelberger's death. Pozo told Alvarado "that his cooperation was necessary because there was a reward for finding the perpetrator of the Schaufelberger assassination, and that Maj. Pozo wanted to give the reward to 'his boys,' Mr. Alvarado's torturers." Alvarado was tortured over the course of four days, after which point he "could not withstand further torture, and he signed a statement, which he did not read, and which he later discovered

attributed to him responsibility for the Schaufelberger murder." Alvarado was subsequently taken to a media event at the Treasury Police headquarters—at which Defendant presided—and was forced to say that he killed Lt. Cmdr. Schaufelberger. Upon return to his cell, Alvarado was once again tortured with electric shocks, causing him to suffer a nervous breakdown. Alvarado was transferred to another cell within "the more public part" of the Treasury Police headquarters eighteen days later. Several weeks later, he was questioned by two representatives from the United States and was given a polygraph exam, which confirmed Alvarado "had been tortured and that he did not participate in the Schaufelberger assassination." (Def.'s Resp. Pls.' SOMF ¶¶ 64–88.)

## III.  Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). So long as the movant has met its initial burden of "demonstrat[ing] the absence of a genuine issue of material fact," *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548, and the nonmoving party is unable to make such a showing, summary judgment is appropriate. *Emmons v. McLaughlin,* 874 F.2d 351, 353 (6th Cir.1989). In considering a motion for summary judgment, "the evidence as well as all inferences drawn therefrom must be read in a light most favorable to the party opposing the motion." *Kochins*

---

**3.**  Alvarado originally brought his claims un-

der a pseudonym, John Doe. *See supra* n. 1.

*v. Linden–Alimak, Inc.*, 799 F.2d 1128, 1133 (6th Cir.1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

When confronted with a properly-supported motion for summary judgment, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 250 (6th Cir.1998). A genuine issue of material fact exists for trial "if the evidence [presented by the nonmoving party] is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In essence, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505.

## IV. Analysis

Plaintiffs allege that Defendant is liable under a theory of command responsibility for acts of torture, extrajudicial killing, and crimes against humanity that were perpetrated against Plaintiffs and/or their family members. They seek summary judgment on several of these predicate acts: (1) Chavez's claims of torture and extrajudicial killing under the ATCA and the TVPA; (2) Santos's claim of torture under the TVPA; (3) Calderon's claims of torture and extrajudicial killing under the TVPA; (4) Revelo's claim of extrajudicial killing under the ATCA and the TVPA;

and (5) Alvarado's claim of torture under the ATCA and the TVPA. (Pls.' Mot. Summ. J. 2.)

Defendant argues broadly that "Plaintiffs' case and claims are tendered by reliance upon hearsay, double-hearsay, triple-hearsay, irrelevance, denial of due process and all of the other objections" Defendant has set forth in earlier submissions to the Court. (Def.'s Mem. Opp. 1.) In particular, Defendant challenges Plaintiffs' reliance on the Truth Commission Report. He also claims that he "cannot even investigate the truthfulness of the allegations or find witnesses as to the alleged incidents to which he was not present or aware." (*Id.* at 2.) With the exception of the facts taken from the Truth Commission Report, Defendant does not dispute the facts that underlie Plaintiffs' claims of torture and extrajudicial killing. (*See* Def.'s Resp. Pls.' SOMF.) [4]

### A. Applicable Law

■ The Alien Tort Claims Act states that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. [5] The Supreme Court recently interpreted the ATCA in *Sosa v. Alvarez–Machain*, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004). *Sosa* held that the ATCA is a "jurisdictional statute creating no new causes of action" but that the grant of jurisdiction was "enacted on the understanding that the common law would provide a cause of action for the modest num-

---

4. Defendant also argues repeatedly that Plaintiffs cannot prove a "causal connection" between the acts complained of and Defendant's knowledge or involvement. As Plaintiffs' motion does not seek summary judgment on any aspect of Defendant's liability under the theory of command responsibility, however, the Court will not address this argument.

5. Courts sometimes refer to this statute as the "Alien Tort Statute" or the "Alien Tort Act." *See, e.g., Sosa v. Alvarez–Machain*, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004); *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir.1995).

ber of international law violations with a potential for personal liability at the time [of its enactment]." 124 S.Ct. at 2761. The Court did not specify which violations of international law norms are actionable under the ATCA, but courts have since construed *Sosa* to permit claims of torture and extrajudicial killing to go forward under the ATCA. *See, e.g., Aldana v. Del Monte Fresh Produce, N.A., Inc.,* 416 F.3d 1242, 1251 (11th Cir.2005) (holding plaintiffs "can raise separate claims" for state-sponsored torture under the [ATCA] and also under the [TVPA] ); *Mujica v. Occidental Petroleum Corp.,* 381 F.Supp.2d 1164, 1179 (C.D.Cal.2005) (recognizing claims of torture and extrajudicial killing under ATCA); *Doe v. Saravia,* 348 F.Supp.2d 1112, 1144–45 (E.D.Cal.2004) (recognizing claim of extrajudicial killing under ATCA and TVPA); *but see Enahoro v. Abubakar,* 408 F.3d 877, 885 (7th Cir. 2005) (construing *Sosa* to limit relief against torture and extrajudicial killing to the TVPA and dismissing plaintiffs' torture claim brought solely under ATCA).

█ The Torture Victim Protection Act provides that:

> [a]n individual who, under actual or apparent authority, or color of law, of any foreign nation . . . (1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or (2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death.

28 U.S.C. § 1350 note. The TVPA provides an "unambiguous and modern basis for a cause of action" for torture and extrajudicial killing. H.R.Rep. No. 102–367(II), *reprinted in* 1992 U.S.C.C.A.N. at 86. Unlike the ATCA, both citizens and non-citizens of the United States may file

claims under the TVPA. *See Saravia,* 348 F.Supp.2d at 1145.

## B. Torture

█ To prove a claim of torture under either the ATCA or the TVPA, each Plaintiff must first establish that governmental actors carried out the alleged torture to which they were subjected. *See* 28 U.S.C. § 1350 note § 2(a) ("An individual who, under actual or apparent authority, or color of law, of any foreign nation . . . subjects an individual to torture shall . . . be liable. . . ."); H.R.Rep. No. 102–367(III), *reprinted in* 1992 U.S.C.C.A.N. at 87 (noting that suits against "purely private groups" are not actionable under the TVPA and that "the plaintiff must establish some governmental involvement in the torture to prove a claim"); *Aldana,* 416 F.3d at 1247 (recognizing state action as necessary element of torture under the ATCA); *Kadic,* 70 F.3d at 243–44 (holding torture actionable under the ATCA "only when committed by state officials or under color of law"). When persons who are not government officials "act[ ] together with state officials" or act with "significant state aid[,]" they are deemed governmental actors for the purposes of the state action requirement under the TVPA and the ATCA. *Saravia,* 348 F.Supp.2d at 1145 (noting courts look to the jurisprudence of 42 U.S.C. § 1983 "as a guide to determine when persons who are not themselves government officials, nonetheless act under apparent authority or color of law").

The TVPA defines torture as any act (1) "directed against an individual in the offender's custody or physical control[;]" (2) that inflicts "severe pain or suffering[,] . . . whether physical or mental[;]" (3) for the purpose of obtaining information, intimidation, punishment or discrimination. 28 U.S.C. § 1350 note § 3(b)(1). The ATCA does not define torture. Courts analyzing ATCA torture claims generally rely on the

definition set forth in the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), which is substantially the same as the TVPA definition.[6] *See Aldana,* 416 F.3d at 1251 (relying on CAT definition of torture to evaluate ATCA claim); *see also Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 244 F.Supp.2d 289, 326 (S.D.N.Y.2003); *Kadic,* 70 F.3d at 243–44.

#### 1. Chavez

■ As set forth above, each Plaintiff must first establish that governmental actors were involved to make out a claim of torture under the ATCA and the TVPA. *See* 28 U.S.C. § 1350 note § 2; H.R.Rep. No. 102–367(III), *reprinted in* 1992 U.S.C.C.A.N. at 87; *Aldana,* 416 F.3d at 1247; *Kadic,* 70 F.3d at 243–44.

Under this standard, a triable issue of material fact exists as to whether government actors were involved in Chavez's alleged torture. The undisputed fact show that masked men—dressed in civilian clothes, carrying rifles, and demanding propaganda and money—carried out the attack on Chavez's family. (Def.'s Resp. Pls.' SOMF ¶¶ 2–6.) Chavez characterizes this group of men as members of a "death squad" working in cooperation with the government to carry out attacks on civilians, citing the Truth Commission Report, which states that Salvadoran armed forces "operated on the death squad model" and that operations were carried out by "members of the armed forces, usually wearing civilian clothing, without insignias, and

driving unmarked vehicles." (Truth Comm'n Report at PL0161, PL0166) ("The members of such groups usually wore civilian clothing, were heavily armed, operated clandestinely and hid their affiliation and identity. They abducted members of the civilian population....") Defendant, however, argues that Plaintiffs simply presume—without proof—that the men who killed Chavez's parents were members of government-affiliated death squads. (Def.'s Mem. Opp. Pls.' Mot. Partial Summ. J. at 2.)

The Court agrees that, in order to find the requisite state involvement in Chavez's claims, the Court would have to infer from the fact that government-sponsored death squads operated in El Salvador during this period that the men who killed Chavez's parents must have been members of death squads. On a motion for summary judgment, however, the Court must draw all inferences in the nonmovant's favor. *Kochins v. Linden–Alimak, Inc.,* 799 F.2d 1128, 1133 (6th Cir.1986) ("A summary judgment movant bears the burden of clearly and convincingly establishing the nonexistence of any genuine issue of material fact, and the evidence as well as all inferences drawn therefrom must be read in a light most favorable to the party opposing the motion.") Accordingly, the Court finds that Chavez has failed to demonstrate the absence of a genuine issue of material fact on the issue of state involvement. *Cf. Aldana,* 416 F.3d at 1248–49 (granting defendants' motion to dismiss torture claim under ACTA and TVPA

---

**6.** The Convention defines torture as:

any act by which severe pain and suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed, or intimidating or coercing him or a third person, or for any reason based on discrim-

ination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.

Part I, Article I, G.A. Res. 39/46, U.N. GAOR, Supp. No. 51, U.N. Doc. A/39/51 (1984).

where plaintiffs' allegation that police knew of and deliberately ignored private security force attack on civilians was based solely on the fact that the police station was nearby). The Court DENIES Chavez's motion for summary judgment as to the predicate act of torture under the ATCA and the TVPA.

### 2. Santos

■ Plaintiff Cecilia Santos alleges that she was subject to torture under the TVPA. The undisputed facts demonstrate that Santos suffered severe pain and suffering—she was sexually assaulted, given electric shocks, and burned with acid while in the custody of the Salvadoran National Police. (Def.'s Resp. Pls.' SOMF ¶¶ 28–29, 34–35, 37); *see Doe v. Qi*, 349 F.Supp.2d 1258, 1317 (N.D.Cal.2004) (finding "use of particularly heinous acts such as electrical shock or other weapons or methods designed to inflict agony does constitute torture"). Santos was tortured for the purpose of "obtaining information, intimidation, punishment or discrimination," 28 U.S.C. § 1350 note § 3(b), as evidenced by the fact that she was accused of having planted a bomb and asked to identify people in several pictures (Def.'s Resp. Pls.' SOMF ¶¶ 20, 32–33, 38). Finally, Santos has established government involvement in her torture. She claims that she was in the custody of officials from the Corporation of National Investigation ("CAIN"), a subsection of the Salvadoran National Police,[7] and was repeatedly told that she was in the National Police headquarters. After her torture and interrogation had concluded, one of her interrogators told a "man in a green uniform" that Santos was "in the deposit of the Ministry of Defense." (*Id.* ¶¶ 23–25, 31, 36, 41.) The undisputed facts plainly

indicate that Santos was subjected to severe pain and suffering by individuals acting under color of law for the purpose of obtaining information, intimidation, or punishment. Accordingly, the Court GRANTS Santos' motion for summary judgment as to her predicate act claim that she was tortured under the TVPA.

### 3. Calderon

■ Plaintiff Calderon alleges that he was subjected to severe pain and suffering by being forced to witness the death of his father and by being threatened with imminent death. The TVPA defines "mental pain or suffering" as:

> prolonged mental harm caused by or resulting from ... (C) the threat of imminent death; or (D) the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.

28 U.S.C. § 1350 note § 3(b)(2). The undisputed facts show that Calderon's attackers forced him to the ground, stepped on him, and pointed a rifle at his back. After the men shot his father, Calderon thought he would be shot next. (Def.'s Resp. Pls.' SOMF ¶¶ 49–55); *see Qi*, 349 F.Supp.2d at 1318 (finding plaintiff subjected to mental torture under TVPA where forced to "witness the guards' severe mistreatment of a close friend"); *Aldana*, 416 F.3d at 1251–52 (finding threats of imminent death to constitute severe mental suffering under both ATCA and TVPA).

■ Calderon has also established the requirement of state action. He observed "uniformed members of the National Police wearing bulletproof vests" outside his

---

7. Defendant admits this statement, as per Santos' testimony, but notes that he was "not familiar with the National Police and did not

know the name 'CAIN' and whether it was a proper name." (*Id.* ¶ 25.)

house who demanded that he open the door. One of the men carried a "G3 military-issued rifle." (Def.'s Resp. Pls.' SOMF¶¶ 46–55; *see also* Truth Comm'n Report at PL0263 ("G3 rifles were the regulation weapon of the security forces at the time and were used by the armed forces of El Salvador in the war against Honduras in 1969."))

▇ Finally, Calderon has demonstrated that the men who carried out the attack and killed his father acted with the purpose of obtaining information, intimidation, punishment, or discrimination. Plaintiffs claim that Calderon was tortured in order to punish him for his father's "presumed political beliefs and ideology," and they assert that Calderon's father's arrest approximately three months earlier—for possession of allegedly "subversive" flyers— was the motivation behind the killing. (Mem. Support Pls.' Mot. Summ. J. 16.) The Court finds this purported connection somewhat speculative. However, the unexpected, late-night, and forcible nature of the men's entry, as well as the shots fired into the air upon the men's departure, demonstrate a clear effort to intimidate or coerce. Accordingly, the Court concludes that Calderon has established all of the requisite elements of torture, as defined under the TVPA, and GRANTS his motion for summary judgment as to this claim.

### 4. Alvarado

▇ Finally, Plaintiff Daniel Alvarado seeks summary judgment on his claim of torture under the ATCA and the TVPA. The undisputed facts plainly reveal that Alvarado was subjected to severe pain and suffering by members of the Treasury Police, including electric shocks and beatings. The facts also demonstrate that Alvarado was tortured until he agreed to sign a statement stating that he had murdered Lt. Cmdr. Albert Schaufelberger, a United States military adviser. Finally, Defen-

dant does not dispute that Major Ricardo Pozo, chief of the intelligence section of the Treasury Police and the lead investigator in Lt. Cmdr. Schaufelberger's death, was in charge of the men who tortured Alvarado. (Def.'s Resp. Pls.' SOMF ¶¶ 64–75.) The Court concludes that Alvarado has thus established governmental involvement, as well as the other elements of torture, under the TVPA and ATCA. His motion for summary judgment as to this predicate act is GRANTED.

### C. Extrajudicial Killing

▇ The TVPA defines extrajudicial killing as:

a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

28 U.S.C. § 1350 note § 3(a). Courts rely on this definition to analyze claims of extrajudicial killing under the ATCA as well. *See Saravia*, 348 F.Supp.2d at 1148, 1153– 54. To make out a claim for extrajudicial killing under both the TVPA and the ATCA, Plaintiffs must show that the killing was carried out under actual or apparent authority, or color of law, of any foreign nation. *See* 28 U.S.C. § 1350 note § 2(a) ("An individual who, under actual or apparent authority, or color of law, of any foreign nation ... subjects an individual to extrajudicial killing shall ... be liable...."); H.R.Rep. No. 102–367(III), *reprinted in* 1992 U.S.C.C.A.N. at 87 (noting that suits against "purely private groups" are not actionable under the TVPA); *Saravia*, 348 F.Supp.2d at 1149–50 ("Under Section 2(a) of the TVPA, in order to make out a claim for extrajudicial killing, plain-

tiff must show that [Defendant] acted under actual or apparent authority, or color of law, of any foreign nation. Courts have generally required this showing for extrajudicial killing claims under the ATC as well."); *Kadic,* 70 F.3d at 243–44 (holding summary execution actionable under the ATCA "only when committed by state officials or under color of law").

### 1. Chavez

Chavez seeks summary judgment on her claim that her parents were summarily executed by government-affiliated death squads. As set forth above, however, a triable issue of fact exists as to whether there was government involvement or substantial cooperation between private individuals and the government in her parents' deaths. *See supra* Part IV B.1. Accordingly, Chavez's motion for summary judgment on these claims, under both the TVPA and the ACTA, is DENIED.

### 2. Calderon

■ The undisputed facts surrounding the murder of Calderon's father demonstrate that all of the requirements for extrajudicial killing under the TVPA are met. Namely, Calderon observed men—carrying military-issued rifles and accompanied by members of the National Police—enter his home and deliberately execute his father without judicial process or for any apparent lawful reason. (Def.'s Resp. Pls.' SOMF ¶¶ 46–55.) As Defendant does not dispute Calderon's claim, there is no genuine issue of material fact on this predicate act. Accordingly, Calderon's motion for summary judgment as to his claim of extrajudicial killing under the TVPA is GRANTED.

### 3. Revelo

Revelo's claim that her husband, Manuel Franco, was summarily executed is not based on her personal knowledge, but rather on the findings of the Truth Commission Report. *See supra* n. 2. Accordingly, the Court must first determine whether the Report constitutes admissible evidence. *See Turner v. Scott,* 119 F.3d 425, 430 (6th Cir.1997) ("summary judgment rulings must be based on admissible evidence"); *Wiley v. United States,* 20 F.3d 222, 226 (6th Cir.1994) ("hearsay evidence cannot be considered on a motion for summary judgment").

Federal Rule of Evidence 803(8)(C) provides an exception to the hearsay rule for "[r]ecords, reports, statements ... of public offices or agencies, setting forth ... factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." Fed.R.Evid. 803(8)(C). The Rule creates a presumption of admissibility, which the opposing party has the burden to overcome by proving its untrustworthiness. *Bank of Lexington & Trust Co. v. Vining–Sparks Sec., Inc.,* 959 F.2d 606, 616 (6th Cir.1992).

■ As a threshold matter, the Truth Commission Report must have been prepared by a "public office or agency" to fall under Rule 803(8)(C). The Report was prepared by the United Nations Truth Commission on El Salvador, which was formally created by the April, 1991, Mexico Agreements between the Government of El Salvador and the Frente Farabundo Martí para la Liberación National ("FMLN"). The Mexico Agreements defined the functions and powers of the Commission, which were expanded by the parties' Peace Agreement in 1992. (Truth Comm'n Report at PL0017–18.) It is apparent that the United Nations Truth Commission on El Salvador is a "public office or agency" under the meaning of Rule 803(8)(C). *See United States v. M'Biye,* 655 F.2d 1240, 1242 (D.C.Cir.1981) (finding that United Nations is a "public

office or agency" for Rule 803(10) purposes) ("The U.N. is an organization composed of nation members. It would defy reason to suppose that such an organization, constituted of public entities of the highest political order, would not itself be a public agency.")

It is equally clear that the Truth Commission Report sets forth "factual findings," and not merely a "recitation of statements of other individuals...." *Miller v. Field,* 35 F.3d 1088, 1092 (6th Cir. 1994) (holding investigative police reports comprised of summaries of interviews with witnesses, victim, and prosecutor that contained "neither factual findings made by the report's preparers nor conclusions and opinions based upon such factual findings" inadmissible under Rule 803(8)(C)); *see also Combs v. Wilkinson,* 315 F.3d 548, 555–56 (6th Cir.2002) (rejecting argument that investigative report was not admissible under Rule 602 or 803(8) for lack of authors' personal knowledge because such reports "embody the results of investigation and accordingly are often not the product of the declarant's firsthand knowledge") (quotation omitted); *Hill v. Marshall,* 962 F.2d 1209, 1215 n. 2 (6th Cir. 1992) (admitting report under Rule 803(8)(C) based on interviews with witnesses where author did not have personal knowledge of events); *Bridgeway Corp. v. Citibank,* 201 F.3d 134, 143 (2d Cir.2000) (holding United States State Department Country Reports for Liberia admissible under Fed.R.Evid. 803(8)(C) and noting the rule "renders presumptively admissible not merely ... factual determinations in the narrow sense, but also ... conclusions or opinions that are based upon a factual investigation") (internal quotations omitted). Finally, it is evident, as set forth above, that the Report's findings resulted "from an investigation made pursuant to authority granted by law." Fed.R.Evid. 803(8)(C); (Truth Comm'n Report at PL0009) (noting Commissioners "were en-trusted with their task by the Secretary–General of the United Nations").

Having concluded that the Truth Commission Report is presumptively admissible, Defendant has the burden to prove that the Truth Commission Report is not sufficiently trustworthy. See *Bank of Lexington & Trust Co.,* 959 F.2d at 616. To determine whether a report is trustworthy, the court considers four factors: (1) the timeliness of the investigation, (2) the special skill or experience of the investigators, (3) whether the agency held a hearing, and (4) possible motivational problems. *Id.* Defendant's sole argument is that the Report is based on hearsay, not first-hand knowledge. (Def.'s Mem. Opp. Pls.' Mot. Summ. J. 4.) This recitation is insufficient to overcome the Report's presumptive admissibility, and it is clear that the Report satisfies each of the four indicators of trustworthiness.

First, the Report is based on an investigation that began in a timely fashion upon the signing of the Peace Agreement between the Salvadoran government and the FMLN. (Truth Comm'n Report at PL0009, PL0018) (noting work began on July 13, 1992, following signing of Peace Agreement in January). Second, the credentials of the Commissioners—a former president of Columbia; a congressman and former Minister of Foreign Affairs of Venezuela; and an international law professor in the United States and former president of the Inter–American Court of Human Rights—as well as their advisors, consultants, and researchers appear more than sufficient to satisfy the requirement that the investigators have special skill or experience. (*See id.* at PL0236–43.) The third factor under the trustworthiness inquiry is whether the agency held a hearing. While the Truth Commission did not hold formal hearings, it did conduct numerous interviews and examined thousands of complaints, court

papers, and other documents. (*Id.* at PL0010.)

Finally, there is no evidence of "motivational problems" or bias in the Commission's methodology or conclusions. (*See id.* at PL0025–26) ("[T]he Commission felt that it had a special obligation to take all possible steps to ensure the reliability of the evidence used to arrive at a finding. In cases where it had to identify specific individuals as having committed, ordered or tolerated specific acts of violence it applied a stricter test of reliability.... In order to guarantee the reliability of the evidence it gathered, the Commission insisted on verifying, substantiating and reviewing all statements as to facts, checking them against a large number of sources whose veracity had already been established.")

As the Truth Commission Report exhibits all four indicators of trustworthiness and Defendant has offered nothing to rebut its admissibility, the Court finds that the Report is admissible under Rule 803(8)(C) of the Federal Rules of Evidence. Having determined that the Report is admissible, the Court now turns to the sufficiency of Revelo's allegations of the extrajudicial killing of her husband, Manuel Franco.

■ According to the Truth Commission report, Franco was a leader of the Democratic Revolutionary Front ("FDR"). On November 27, 1980, Franco and five other FDR leaders were abducted by "one or more public security forces" from the Colegio San Jose, in San Salvador. Treasury Police provided the external security operation, "which aided and abetted the perpetrators." (Truth Comm'n Report at PL0068–69.) Their bodies were later dumped along the road outside of San Salvador. (*Id.* at PL0070.) Revelo found her husband's body on the floor of a funeral home and observed gunshot wounds to his mouth and thorax, as well as a "very well-defined burn that surrounded his entire neck." (Revelo Dep. at 31.) The Court finds that there is no genuine issue of material fact on Revelo's claim that her husband was killed without judicial process by state actors. Accordingly, Revelo's motion for summary judgment as to her extrajudicial killing claim under the ATCA and the TVPA is GRANTED.

## VI. Conclusion

For all of the reasons set forth above, Plaintiff Chavez's motion for summary judgment on her claims of torture and extrajudicial killing under the ATCA and the TVPA, as predicate acts under Plaintiffs' theory of command responsibility, is DENIED. Plaintiff Santos' motion for summary judgment on her claim of torture under the TVPA, as a predicate act under Plaintiffs' theory of command responsibility, is GRANTED. Plaintiff Calderon's motion for summary judgment on his claims of torture and extrajudicial killing under the TVPA, as predicate acts under Plaintiffs' theory of command responsibility, is GRANTED. Plaintiff Revelo's motion for summary judgment on her claim of extrajudicial killing under the TVPA and the ATCA, as predicate acts under Plaintiffs' theory of command responsibility, is GRANTED. Plaintiff Alvarado's motion for summary judgment on his claim of torture under the TVPA and the ACTA, as a predicate act under Plaintiffs' theory of command responsibility, is GRANTED.

So ORDERED this *25* day of October, 2005.