Rufus **KPADEH**, et al., Plaintiffs

v.

Charles McArthur **EMMANUEL**, Defendant.

No. 09–20050–CIV.

United States District Court, S.D. Florida, Miami Division.

Aug. 25, 2009.

Troy Edward Elder, FIU College of Law, Miami, FL, Piper M. Hendricks, Theresa L. Harris, World Organization for Human Rights, Washington, DC, for Plaintiffs.

Charles McArthur Emmanuel, Marion, IL, pro se.

## Order Denying Plaintiffs' Motion for Class Certification

ADALBERTO JORDAN, District Judge.

For the reasons set forth below, the plaintiffs' motion for class certification [D.E. 23] is DENIED.

### I. Background

This case arises from the tenure of Charles McArthur Emmanuel (a/k/a Chuckie Taylor, or "Mr. Taylor") as the commander of the Liberian Anti–Terrorism Unit (ATU) from 1997–2003. *See* Complaint, at ¶ 3 [D.E. 1]. During this time, the ATU—under Mr. Taylor's control—terrorized the civilian population of Liberia by carrying out acts of torture, cruel punishment, arbitrary arrest, and prolonged detention. The plaintiff's—Rufus Kpadeh, Nathaniel Koah, Esther Koah, Mamie Koah, and Anthony Sonkarlay—alleged in their complaint that they were among Mr. Taylor's victims, and asserted claims against Mr. Taylor under the Alien Tort Statute, 28 U.S.C. § 1350; the Torture Victims Protection Act, 28 U.S.C. § 1350 Note; various treaties, covenants, and declarations of international law; Florida law; and Liberian law. Mr. Taylor failed to appear and defend against the plaintiffs' allegations, and a default as to liability was entered against him on February 26, 2009. *See* Clerk's Entry of Default [D.E. 16]. Accordingly, all factual allegations in the complaint are deemed admitted. *See Cotton v. Mass. Mutual Life Ins. Co.*, 402 F.3d 1267, 1278 (11th Cir.2005); 10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2688 (3rd ed.1998). These factual allegations, which are summarized below, easily suffice to legally establish the plaintiffs' claims against Mr. Taylor. *See, e.g., Cabello v. Fernandez–Larios*, 402 F.3d 1148, 1156–60 (11th Cir.2005).[1]

Esther Koah was severely beaten during a search of her home by ATU soldiers serving under the command of Mr. Taylor. She and her 17–year old daughter Mamie were both raped by the soldiers, and Mrs. Koah was detained for 10 days following her rape without ever being charged with a crime. *See* Complaint at ¶¶ 60–69. Mrs. Koah and her daughter were targeted by ATU soldiers because her husband, Nathaniel Koah, ran for elected office on the ticket of a party that opposed the ultimately successful presidential candidacy of Charles Taylor, Sr. (Mr. Taylor's father). Fearful for his life after his close friend was murdered due to his criticism of President Taylor's regime, Mr. Koah ceased his political activities.

Despite this acquiescence, Mr. Koah was twice arrested by the ATU. During his first arrest, Mr. Koah was publicly flogged and detained for nine days without being charged with any crime. Nine months later, he was arrested again based on Mr. Taylor's suspicion that Mr. Koah possessed a valuable diamond. When Mr. Koah could not produce this diamond, he was sent to Gbatala, an ATU-operated prison camp. During the four months he was incarcerated, Mr. Koah was subjected to seemingly unthinkable atrocities. In addition to undergoing regular beatings and forced sodomy, Mr. Koah was routinely burned with melting plastic sheets, covered with driver ants, and forced to drink urine and eat cigarette butts. For much of the time he was held at Gbatala, he was forced to stand upright in a pit filled with water and covered with steel bars. On one occasion he was forced to eat two pounds of salt. On another, he was bound, gagged and hung upside-down over a fire, while his captors threw cotton and acid into the flames in order to increase the amount of smoke. Mr. Koah was ultimately released when a human rights group successfully petitioned for a writ of habeas corpus, but was forced to live in exile for more than seven years due to a continued threat to his safety from the ATU. *See* Complaint at ¶¶ 36–59.

Rufus Kpadeh, another of Mr. Taylor's victims, was arrested by ATU soldiers while fleeing his native village following its attack by rebels who opposed President Taylor. Mr. Kpadeh was given the option of either

---

1. Mr. Taylor, who is an American citizen by birth, was prosecuted criminally in the Southern District of Florida for his conduct as commander of the ATU. A jury found him guilty of six counts of torture and two firearm offenses, and Judge Altonaga sentenced him to a term of imprisonment of 97 years. *See United States v. Belfast*, No. 06–20758–CR (S.D.Fla.2006).

joining the ATU or confessing to membership in the rebel opposition. When he refused to do either, he was sent to the Gbatala prison camp, where he was detained for two months. During his period of incarceration, Mr. Kpadeh was frequently interrogated about his suspected allegiance to Liberian rebels. His interrogators would force his head into a five-foot deep pit filled with human waste in their attempts to coerce a confession. When he refused to confess, the soldiers mutilated Mr. Kpadeh's penis, raped him, and forced him to sodomize other prisoners. Throughout his period of incarceration he was confined in a pit-like cell with five other prisoners, all of whom were denied clothing. From his cell, he could hear the infliction of torture upon other prisoners, including what he believed to be the sound of three inmates being burned alive. Mr. Kpadeh was routinely raped, covered in driver ants, burned with melted plastic sheets, and forced to drink his own urine and eat cigarette butts. For sport, the ATU soldiers would require their prisoners, including Mr. Kpadeh, to play soccer with a large stone in lieu of a ball. Mr. Kpadeh was transferred from Gbatala to the Gbarnga City police station when the ATU learned that a human rights organization planned on investigating the camp due in response to reports of human rights abuses. He was subsequently released shortly thereafter. As a result of his incarceration and treatment, Mr. Kpadeh suffered permanent physical ailments including deep scars, renal problems, sexual dysfunction, and nerve damage. He also lost more than half of his body weight while at Gbatala, dropping from approximately 185 pounds to less than 90 after his release. *See* Complaint at ¶¶ 19–35.

Finally, Anthony Sonkarlay was arrested from his home by an ATU unit and brought to a prison beneath President Taylor's mansion in Monrovia. After four days of imprisonment, he was given a blank charging sheet and told to make a voluntary statement confessing to his crimes. At the direction of his captors, Mr. Sonkarlay made a false statement that detailed his involvement with diamond mining that went on in a nearby village and his knowledge of a particular diamond. One week later, he was transferred to Gbatala. During his detention, he was kept-along with several other prisoners—in a three-foot by three-foot pit that was filled with water and covered by metal bars, requiring Mr. Sonkarlay to tilt his head back in order to breathe. At night, the pit was covered with a mattress, which further reduced the already minimal circulation. On one occasion, Mr. Sonkarlay was thrown in a pit along with Mr. Koah, with a partition of barbed wire separating the two men. The ATU soldiers poured hot coals over the prisoners and ordered the men to fight each other, which required them to reach through the barbed wire and sustain serious cuts. Mr. Sonkarlay was also frequently interrogated about the whereabouts of the diamond (the existence of which he had fabricated in his coerced statement while imprisoned beneath the presidential mansion). His mistreatment included beatings, being forced to drink urine, and being forced to catch hot coals. Mr. Sonkarlay was transferred out of Gbatala prison after a family member obtained a writ of habeas corpus, and the charges brought against him were ultimately dismissed by a Liberian court. *See* Complaint at ¶¶ 70–86.

After default on liability was entered against Mr. Taylor, the named plaintiffs moved to certify as a class all persons whose human rights were violated by Mr. Taylor and the ATU forces working under his command. Accordingly, class certification at this stage would function primarily to apportion damages as to each of Mr. Taylor's victims. *See* Motion to Certify Class at 1 [D.E. 23] ("Plaintiffs seek certification under Rule 23(b)(3) for a class of general, compensatory, and punitive damages.").

## II. ANALYSIS

"For a district court to certify a class action, the named plaintiffs must have standing, and the putative class must meet each of the requirements specified in Federal Rule of Civil Procedure 23(a), as well as at least one of the requirements set forth in Rule 23(b)." *Vega v. T–Mobile USA, Inc.,* 564 F.3d 1256, 1265 (11th Cir.2009) (citations omitted). The burden of establishing the Rule 23 requirements is on the party or parties seeking class

certification. *See Heaven v. Trust Company Bank*, 118 F.3d 735, 737 (11th Cir.1997). Under Rule 23(a) the plaintiffs must demonstrate: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of both class plaintiffs and class counsel. *See Vega*, 564 F.3d at 1265. The plaintiffs argue that they meet the four requirements of Rule 23(a), and further assert that this case is maintainable as a class under Rule 23(b)(3), because common questions of law and fact predominate over questions affecting individual plaintiffs, and that the class action presents the superior method for resolution of these claims.

Rule 23(b)(3) burdens the plaintiffs with demonstrating that "questions of law or fact common to class members predominate over any questions affecting only individual member, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." In the words of the Supreme Court, "the Rule 23(b)(3) predominance inquiry tests whether the proposed class is sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). This certification standard is similar to the commonality requirement of Rule 23(a), but Rule 23(b)(3) is more demanding and mandates caution, particularly where "individual stakes are high and disparities among class members great." *See id.*

The plaintiffs contend that the predominance requirement of Rule 23(b)(3) is met because "[t]he question of overriding significance in this case is whether [Mr.] Taylor's conduct, and that of persons acting under his command, violated international law," and that the variation in the degree of injury and pain and suffering between the class members does not mean the issue of Mr. Taylor's conduct does not predominate. *See* Motion to Certify Class, at 14. I disagree.

Given that the plaintiffs' allegations are deemed admitted, there can be little doubt that the prolonged arbitrary detention and torture of prisoners fell below any acceptable standard of international law. *See, e.g., Sosa v. Alvarez–Machain*, 542 U.S. 692, 732–33, 737, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004) (holding that a complaint must allege a clear violation of generally accepted norms of international law and noting that "a 'state violates international law if, as a matter of state policy, it practices, encourages, or condones ... prolonged arbitrary detention' ") (quoting Restatement (Third) of Foreign Relations Law of the United States § 702); *Aldana v. Del Monte Fresh Produce, N.A.*, 416 F.3d 1242, 1246 (11th Cir.2005) ("State-sponsored torture ... likely violates international law and is therefore actionable under the Alien Tort Act."). But one set of operative facts regarding Mr. Taylor's reign of terror in Africa would not establish his liability as to each individual class claimant; it is not necessarily the case—at least not so far—that every person detained by the ATU was tortured or detained in violation of international law. Instead, the primary issue in this case would be whether each alleged victim was tortured and arbitrarily detained to the extent that international law was violated, *see Sosa*, 542 U.S. at 737, 124 S.Ct. 2739 (holding that a brief arbitrary detention does not violate international law), and if so the amount of damages each victim is entitled to recover under the Alien Torture Statute, the Torture Victims Protection Act, international law, Florida law, and Liberian law. This inquiry is necessarily fact and case specific as to each potential victim.[2]

In cases where the determination of liability and/or damages requires a case-by-case inquiry for each prospective plaintiff, courts have generally found the predominance and superiority requirements of Rule 23(b)(3) unsatisfied. The same result is warranted here. *See, e.g., Amchem*, 521 U.S. at 608–610, 117 S.Ct. 2231 (affirming vacatur of class certification order where damages determination required inquiry into the nature of each individual plaintiffs' exposure to asbestos); *Klay v. Humana, Inc.*, 382 F.3d 1241, 1276 (11th Cir.2004) (holding that common

---

**2.** The plaintiffs acknowledge as much in their motion for class certification, noting that "[t]he campaign of terror [Mr.] Taylor waged as Commander is widely-documented and, for the purposes of this case, already established. Thus, Class Members need only provide evidence of their individual harm, not of an overall policy." *See* Motion to Certify Class, at 14.

questions regarding the defendants' alleged pattern and practice of criminal activity predominated as to federal RICO claims, but that district court abused its discretion in certifying a class for all state-law claims, given the case-specific inquiry necessary for their resolution); *Rutstein v. Avis Rent–A–Car Sys.*, 211 F.3d 1228, 1235 (11th Cir.2000) ("Whether Avis maintains a policy or practice of discrimination may be relevant in a given case, but it certainly cannot establish that the company intentionally discriminated against every member of the putative class."); *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1006 (11th Cir.1997) (holding that plaintiffs alleging racial discrimination had failed to show "predominance" because proof concerning the existence of a general policy of racial discrimination could not establish discrimination as to any individual plaintiff); *Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 605 (5th Cir.2006) (affirming denial of class certification under Rule 23(b)(3) because the proceedings required a case-by-case determination of damages); *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 745 (5th Cir.2003) (holding that district court abused its discretion in certifying class "[i]n light of the individual calculation of damages that is required"); *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 342–43 (4th Cir.1998) (concluding that where the claims of the members of a putative class of antitrust plaintiffs are "inherently individualized, ... the need for individual proof of damages" precludes class certification).

That is not to say that every court has declined certification when faced with a proposed class whose claims would require an individualized case-by-case inquiry for resolution. Indeed, two federal courts have certified classes of victims of international human rights abuses under Rule 23. *See Hilao v. Estate of Marcos*, 103 F.3d 767, 774 (9th Cir.1996) (holding that district court did not abuse its discretion in certifying a class of 10,000 plaintiffs with claims for human rights abuses); *Doe v. Karadzic*, 176 F.R.D. 458, 463 (S.D.N.Y.1997) (certifying class of Bosnian genocide victims with claims under the Alien Tort Statute pursuant to the limited funds provision of Rule 23(b)(1), but express-ing "grave doubts about plaintiffs' ability to satisfy their burden under Rule 23(b)(3) of demonstrating that common questions of law and fact will predominate and that the proposed class action will be manageable"). But even those who advocate the relaxation of the Rule 23 requirements in cases of international human rights abuses and applaud the results reached in *Hilao* and *Karadzic* nonetheless agree that the courts in those cases did not engage in intellectually rigorous analyses of the class certification requirements. *See, e.g.,* Margaret G. Perl, Note, *Not Just Another Mass Tort: Using Class Actions to Redress International Human Rights Violations*, 88 Geo L.J. 773, 782–87 (2000) (noting that *Hilao* and *Karadzic* cannot be reconciled with class certification precedent in other mass tort cases); George A. Martinez, *Race Discrimination and Human Rights Class Actions: The Virtual Exclusion of Racial Minorities from the Class Action Device*, 33 J. Legis. 181, 185–86 (2007) (criticizing *Hilao* and *Karadzic* for not engaging in rigorous analyses).

Of these cases, *Hilao*—which the plaintiffs endorse—is admittedly the most factually similar, but I do not find it persuasive. In *Hilao,* a divided panel of the Ninth Circuit affirmed the district court's certification of a class of plaintiffs with claims under the Alien Tort Statute. The class members were victims of the deposed Philippine dictator, Ferdinand Marcos, with claims for human rights abuses ranging from torture to summary execution. Without addressing any of the Rule 23(b) factors, the Ninth Circuit held that the district court had not abused its discretion in certifying the class. *See Hilao,* 103 F.3d at 774. Because each plaintiff required individualized proof of causation and damages and the certified class exceeded 10,000 victims, the district court had appointed a special master to oversee the depositions of 137 members of the proposed class who were selected at random. Based on the testimony of this statistically random sample, the special master developed a formula to apportion damages for the entire class of 10,000. Dissenting from the panel's opinion, Judge Rymer expressed concern at the result reached by her colleagues on the issue of class certifi-

cation, and argued that the procedure used by the district court to manage the class ran afoul of fundamental notions of due process:

> This leaves me "with a profound disquiet[.]" ... Although I cannot point to any authority that says so, I cannot believe that a summary review of transcripts of a selected sample of victims who were able to be deposed for the purpose of inferring the type of abuse, by whom it was inflicted, and the amount of damages proximately caused thereby, comports with fundamental notions of due process. Even in the context of a class action, individual causation and individual damages must still be proved individually.
>
> ...
>
> There is little question that Marcos caused tremendous harm to many people, but the question is which people, and how much. That, I think, is a question on which the defendant has a right to due process. *If due process in the form of a real prove-up of causation and damages cannot be accomplished because the class is too big or to do so would take too long, then (as the Estate contends) the class is unmanageable and should not have been certified in the first place.*

*Id.* at 788 (Rymer, J., dissenting in part) (emphasis added).

This is not a case where liquidated damages are available. I therefore agree with Judge Rymer that a summary review of the deposition transcripts of a sample of the class plaintiffs to determine liability and award damages would fall below the standard of due process owed both to Mr. Taylor and to each individual plaintiff.[3] The disparate experiences of the five named plaintiffs detailed in the complaint, and summarized in this order, proves this point. Under *Hilao*, I

could theoretically and conceivably develop a formula based upon a sampling of claims and assign a monetary figure to each month spent at Gbatala. But I believe this summary resolution of the class members' claims would do a disservice to justice. Indeed, this method would transform a federal district court—an institution that is tasked above all else with doing justice and safeguarding the due process rights of the litigants who appear before it—into a mechanical claims adjustor or a risk assessment center, callously assigning arbitrary awards based on tables developed through statistical sampling of atrocities (e.g., $X for each instance of rape; $Y for genital mutilation; $Z per month of torture and confinement). Under such a scheme, the mathematical formula might award Mr. Koah twice as much as Mr. Kpadeh, based solely on the fact that the former spent four months in Gbatala, while the latter spent just two, effectively eliminating any real consideration of the actual pain and emotional distress suffered by each victim. Meaningful due process dictates more. Although similarly situated plaintiffs must be treated in a roughly similar way with respect to damages, awards cannot be the product of a matrix. Whatever award each claimant ultimately recovers must be based on a finding of liability and must also be the result of an individualized assessment by the finder of fact based on that plaintiff's ordeal, so that it adequately and accurately reflects (and compensates for) the suffering experienced by that plaintiff. *Cf. Grace v. Corbis–Sygma,* 487 F.3d 113, 120–21 (2nd Cir.2007) (reversing award of damages to photo journalist for lost photographic images because the district court applied an "arbitrary methodology" in determining damages, including assigning a per image value to types of images without

---

3. The fact that Mr. Taylor has defaulted on liability as to the named plaintiffs does not eliminate his due right to due process in the remainder of these proceedings. To the contrary, his default places the onus on the court to ensure that any award of damages comports with principles of equity and due process. *See Anheuser Busch, Inc. v. Philpot,* 317 F.3d 1264, 1266(11th Cir. 2003) ("A court [on entering default judgment] has an obligation to assure that there is a legitimate basis for any damage award it enters....");

*Adolph Coors Co. v. Movement Against Racism & the Klan,* 777 F.2d 1538, 1544 (11th Cir.1985) (on default judgment, "[d]amages may be awarded only if the record adequately reflects the basis for award...."). Further, the default on liability does not preclude Mr. Taylor from appearing in these proceedings to challenge the legal sufficiency of the complaint (an issue I have already decided against him) or the amount of damages sought by the plaintiffs. *See Cotton,* 402 F.3d at 1278.

sufficient explanation).[4]

I also conclude that Judge Rymer's dissent is more consistent with the Eleventh Circuit's approach to class certification in cases that require individualized proof of liability and damages. As the Eleventh Circuit noted in *Klay*, the Rule 23(b)(3) predominance inquiry focuses on each class-plaintiff's effect on the presentation of additional evidence:

> [I]f the addition of more plaintiffs to a class requires the presentation of significant amounts of new evidence, that strongly suggests that individual issues (made relevant only through the inclusion of these new class members) are important. If, on the other hand, the addition of more plaintiffs leaves the quantum of evidence introduced by the plaintiffs as a whole relatively undisturbed, then common issues are likely to predominate.

*Klay*, 382 F.3d at 1255. Given that the plaintiffs here are not attempting to prove an "overall policy" of torture on behalf of Mr. Taylor, the evidence presented by each individual plaintiff is wholly (or at least largely) irrelevant to the next class member. And because the resolution of each claim would require a hearing for every member of the proposed class, certification would necessitate that I (or a jury) conduct countless mini-trials in order to determine damages. *See* Complaint at ¶ 14 (alleging "thousands of incidents" of torture, inhuman treatment, arbitrary arrest, prolonged detention, assault, battery, and intentional infliction of emotional distress); Motion to Certify Class at 5–6 (noting that ATU victims numbered, at the very least, in the hundreds). Thus, the judicial synergies and economies of scale contemplated by Rule 23 are not furthered by class certification in this case, as it is the individual issues that will predominate.

Finally, the pitfalls generally associated with the rejection of class certification are not present here. In certain circumstances, the class action mechanism may represent the only vehicle through which aggrieved parties can vindicate their claims. *See, e.g., Caban v. J.P. Morgan Chase & Co.*, 606 F.Supp.2d 1361, 1372 (S.D.Fla.2009) (invalidating a contractual class action waiver provision as unconscionable where the clause effectively immunized the defendant from all of its customers' small-sum claims). But this is not one of those situations. There can be little doubt that the damages suffered by each member of the proposed class is sufficient to warrant the cost and effort inherent to litigation on an individual basis. And even to the extent that Mr. Taylor proves incapable of satisfying any judgments against him (thus rendering contingency fee arrangements impracticable), the claims presented by the members of the proposed class who still wish to proceed individually are precisely the type that fall under the purview of prestigious legal clinics and pro bono litigation efforts. *See, e.g.,* Human Rights Program at Harvard Law School, http://www.law.harvard.edu/programs/hrp/ihrc.html; Amnesty International, Full Reparations Campaign, http://www.amnesty.org/en/international-justice/issues/full-reparations. Mr. Taylor will be incarcerated and amenable to service in a federal prison for the next nine decades, and the federal courts throughout the country remain open to all prospective litigants who wish to file claims against him on an individual basis. Accordingly, declining to certify the proposed class does not render the courts of the United States inaccessible to those not joined in the instant proceedings.

### III. CONCLUSION

The plaintiffs have failed to carry their burden in demonstrating that common questions of law or fact predominate over individual ones. Their motion for certification of the proposed class is therefore DENIED.

By no later than September 7, 2009, the plaintiffs shall indicate in writing whether

---

**4.** I do not pretend that determining damages in a case like this one will be easy; my point is that damages for different plaintiffs should not be determined by reference to an arbitrary formula. Congress could set up a compensatory scheme with set amounts as compensation for certain types of human rights violations under the Alien Tort Statute or the Torture Victims Protection Act, but it has not done so. *Cf. Loth v. Truck–A–Way Corp.*, 60 Cal.App.4th 757, 70 Cal.Rptr.2d 571, 578 (1998) ("[N]or has [our legislature] assigned set values in tort cases for the loss of an eye, ear, limb, or life.")

they wish to have a bench or jury trial on damages; when they will be ready for trial; and how long the trial will last.